898 F.2d 1018
 Melva PRESSEY, Individually and as next Friend for William
H. Pressey, Plaintiff-Appellee, Cross-Appellant,
v.
Kendall R. PATTERSON, Defendant,
W.L. Brasher, etc. and City of Houston,
Defendants-Appellants Cross-Appellees.
 No. 88-2917.
 United States Court of Appeals,
Fifth Circuit.
 April 23, 1990.
 
 Richard H. Cobb, Conner & Dreyer, Houston, Tex., for W.L. Brasher.
 Jack McKinley, Hirsch, Glover, Robinson & Sheiness, Houston, Tex., for City of Houston.
 Michael M. Essmyer, Clinard J. Hanby, Essmyer & Hanby, Gerald M. Birnberg, Houston, Tex., for plaintiff-appellee, cross-appellant.
 Appeal from the United States District Court for the Southern District of Texas.
 Before GOLDBERG, GARWOOD, and DAVIS, Circuit Judges.
 W. EUGENE DAVIS, Circuit Judge:
 
 
 1
 In this section 1983 action, the City of Houston appeals a default judgment in excess of $8 million entered against it after the district court struck its answer for discovery abuse. We reverse the default judgment and remand the case for a trial on liability and to allow the district court to consider a more appropriate sanction.
 
 I.
 
 2
 On October 14, 1983, a truck driven by William Pressey, the plaintiff, approached the scene of a traffic accident that was under investigation and supervision of Houston police officers Kendall Patterson and W.L. Brasher. Pressey failed to move through the accident scene promptly despite Officer Patterson's signals and Patterson approached Pressey's truck. As the truck began to move, Patterson ran alongside it and shot Pressey in the head. Patterson and Brasher later fabricated a story to justify the shooting.[1]
 
 
 3
 Pressey sued Patterson, Brasher, and the City of Houston under both 42 U.S.C. Sec. 1983 and state law. One theory of Pressey's case was that the City of Houston had violated section 1983 by failing to investigate officers with violent propensities, thereby allowing dangerous officers such as Patterson to remain on duty.
 
 
 4
 The discovery phase of the lawsuit was punctuated by a number of discovery disputes and refusals by the City to produce evidence. The most serious discovery incidents concerned the destruction of two cassette tapes. The tapes contained an interview of Sergeant Steve Reiser, a supervisor and spokesperson for the Houston Police Department's internal affairs division, by a Houston Post reporter. Based in part on this interview, the Houston Post published a series of articles exposing inefficiency and incompetence in the internal affairs division. Reiser, who made the tapes, retained them until after the articles appeared. But in late December 1986 or early January 1987, around the time Reiser was transferred from internal affairs to another post, Reiser burned the interview tapes.
 
 
 5
 Before Pressey's attorney learned of the tapes' existence, he had made a number of broad discovery requests concerning the internal affairs division; the City did not produce the tapes of Reiser's interview. When Pressey's attorney did learn that the interview had been taped (well after the tapes had been destroyed) he specifically requested production of the tapes. The City did not respond for several months, but finally informed the court the tapes had been erased through routine reuse.
 
 
 6
 In November 1987, Pressey asked the court to strike the City's answer for discovery abuses. During a deposition ordered as part of the litigation over the sanctions motion, Pressey's attorney learned the tapes of Reiser's interview had not in fact been destroyed through routine reuse but instead had been burned by Reiser. Pressey added this to the reasons why the court should strike the City's answer.
 
 
 7
 The trial judge held a hearing on the sanctions motion and, without issuing specific findings of fact, ordered the City's answer struck "[b]ecause of abuse in the discovery process...." The judge then granted a default judgment against the City on liability.
 
 
 8
 Following a trial on damages, the jury returned a verdict of over $6.7 million. The trial court added prejudgment and postjudgment interest and an award for over $900,000 in attorneys' fees. The City appeals the judgment on liability, the damages award, and the attorneys' fees award. One of the City's codefendants, W.L. Brasher, also appeals the judgment entered against him. Pressey cross-appeals the trial court's calculation of prejudgment interest.
 
 II.
 A. The Standard of Review
 
 9
 The district court did not specify the authority it relied on in striking the City's answer. Pressey asks us to affirm the ruling based on either a broad reading of Federal Rule of Civil Procedure 37(b) or the trial court's inherent power to control litigation and litigants. This court reviews Rule 37(b) sanctions under an abuse of discretion standard. Eastway General Hosp. v. Eastway Women's Clinic, Inc., 737 F.2d 503, 505 (5th Cir.1984), cert. denied, 470 U.S. 1052, 105 S.Ct. 1752, 84 L.Ed.2d 816 (1985); S.E.C. v. First Financial Group of Texas, Inc., 659 F.2d 660, 665 (5th Cir.1981). Sanctions under the federal court's inherent power are also reviewed under an abuse of discretion standard. G. Heileman Brewing Co., Inc. v. Joseph Oat Corp., 871 F.2d 648, 653 (7th Cir.1989); Halaco Eng'g Co. v. Costle, 843 F.2d 376, 379 (9th Cir.1988).
 
 
 10
 While the trial judge, who is most familiar with the circumstances surrounding the litigation, has broad discretion under Rule 37(b) to fashion remedies suited to the misconduct, we have imposed important limitations on that discretion. We have, for example, usually required a finding of bad faith or willful misconduct to support the severest remedies under Rule 37(b) --striking pleadings or dismissal of a case. See Truck Treads, Inc. v. Armstrong Rubber, 818 F.2d 427, 429 (5th Cir.1987). We also consider whether a less drastic remedy would be more tailored to the misconduct and therefore would better serve the purposes of Rule 37. See Batson v. Neal Spelce Associates, Inc. 765 F.2d 511, 516 (5th Cir.1985); Jones v. Louisiana State Bar Ass'n, 602 F.2d 94, 97 (5th Cir.1979).[2]
 
 
 11
 The trial court's discretion to impose sanctions under its inherent power is even more limited. We have confined sanctions under the district court's inherent power to instances of bad faith or willful abuse of the judicial process. See Breazeale v. Smith, 857 F.2d 258, 261 (5th Cir.1988); Matter of Thalheim, 853 F.2d 383, 389 (5th Cir.1988). We have also noted that in the context of the federal court's inherent power, "bad faith" is judged by "necessarily stringent" standards. Batson v. Neal Spelce Associates, Inc., 805 F.2d 546, 550 (5th Cir.1986). With these limitations in mind, we will review the City of Houston's misconduct as reflected in the record before us.
 
 B. Discovery Misconduct
 
 12
 The trial court did not make specific findings when imposing the sanctions. In its oral reasons for judgment, however, the judge alluded to the destruction of the tapes, the City's misrepresentations concerning those tapes, and the City's recalcitrance during the entire discovery phase.
 
 
 13
 1. Destruction of the Reiser Interview Tapes
 
 
 14
 The plaintiff primarily seeks to justify the sanction because the City of Houston, through Sergeant Steve Reiser, deliberately destroyed the tapes. The trial court indicated in its oral reasons for judgment that it was primarily concerned with destruction of the tapes.
 
 
 15
 It is undisputed that Sergeant Reiser intended to destroy the tapes. It is less clear why he did it. As Pressey points out, the record contains some evidence that Reiser knew that the information contained on these tapes might have been relevant to the Pressey case. The City had been served with a number of very broad discovery requests that arguably covered the tapes, and Reiser was one of the City employees involved in satisfying these production requests. Shortly before he destroyed the tapes, Reiser was subpoenaed to testify in another civil rights case involving allegations similar to those Pressey had made.[3] At about the same time, Pressey filed a request that the City admit that Reiser had made the statements attributed to him in the Post articles. From all this, the plaintiff asks us to infer, or more specifically, to uphold the trial court's apparent conclusion, that Reiser destroyed the tapes to prevent Pressey from using them as evidence against the City.
 
 
 16
 But other undisputed circumstances surrounding this case make us unable to accept this conclusion. The interview recorded on the tapes was used as the basis for an article exposing poor practices in the internal affairs division. No reason is suggested why the Houston Post, after conducting a long and tedious investigation of the internal affairs department, would have declined to print any detrimental information it discovered about the department. In other words, anything contained on the tapes that was helpful to Pressey and similarly situated plaintiffs would have almost certainly been printed in the news articles. Hence, destroying the tapes would have been of very little use to the City or to Sergeant Reiser, because presumably all damaging information was already public.
 
 
 17
 Likewise, the record reflects that the Houston Post reporter, Ira Perry, made his own tapes of the interview. Reiser obviously was aware that Perry had these tapes. Hence, even if the tapes contained some damaging information not printed in the articles, as far as Reiser knew, the Houston Post held an identical recording of the interview. We therefore fail to see what Reiser could have hoped to gain by destroying his tapes.
 
 
 18
 It is true that this second copy of the tapes was ultimately unavailable to Pressey's counsel because the trial judge refused to compel Perry to produce it based on the journalist's first amendment privilege to protect confidential sources. However, we cannot conceive that at the time Reiser burned the tapes, he could have anticipated the eventual exclusion of the tapes based on the trial court's interpretation of this privilege.[4] In short, a decision to destroy the tapes in hopes of preventing the information contained on them from being used as evidence would have been an entirely irrational act.
 
 
 19
 Finally, the City had a plausible explanation for Reiser's conduct. Reiser was leaving his post at the internal affairs division at the time he destroyed the tapes and explained that destroying the tapes was simply part of cleaning out his office. When questioned why he did not retain the tapes, Reiser testified that he had made and kept the tapes only as protection against misquotation by the Post, and that because the articles had already appeared, he felt no need to retain the tapes any longer.
 
 
 20
 We are bound by the trial court's findings of fact unless they are "clearly erroneous." Fed.R.Civ.P. 52(a). Insofar as the trial judge found that Reiser destroyed the tapes to prevent their use as evidence, we have "the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948). Because no other evidence supports a conclusion that the City was in bad faith or willfully destroyed the tapes to deprive the court of probative evidence, that destruction alone cannot support the sanction imposed by the trial judge.
 
 2. Misrepresentations Concerning the Tape
 
 21
 Pressey also relies on an incident that occurred when his counsel discovered that tapes of the interview had been made and sought production of them. Counsel for the City first responded that "[n]o tapes have been produced because none exist at this time," and added that the tapes had "likely" been reused. When the question again arose about a month later, the City's counsel informed the court that "the tape supposedly made of [the] interview with Sergeant Reiser [has] been reused and thus erased sometime after the ... articles were published...." There the matter stood until several months later, when Reiser revealed in deposition that he had, in fact, destroyed the tapes.
 
 
 22
 Pressey contends that the City of Houston made knowing misrepresentations to the court to hide the fact that Reiser had burned the tapes. The evidence does show that sometime around the time the City made these representations, an internal affairs officer, Lieutenant Lindsay, asked Sergeant Reiser what had happened to the tapes he made of the interview; Reiser responded that the tapes had been "destroyed." However, we cannot agree with Pressey that this inquiry and the vague response it yielded supports the conclusion that the City knowingly misinformed the court. We cannot, then, find in these representations the willful misconduct or bad faith necessary to support the severe sanction the trial judge imposed.[5] Nothing in the record persuades us that counsel for the City made an intentional misstatement to the court.
 
 3. Recalcitrance during Discovery
 
 23
 The controversy over the Reiser tapes was not the first discovery dispute between these parties. Pressey points out several incidents of questionable conduct on the part of the City and asks us to uphold the sanction based on this misconduct.
 
 
 24
 (a) Disobeyed Discovery Orders
 
 
 25
 Pressey argues that the City had unjustifiably disobeyed two previous discovery orders in this case. The first order directed the City to produce certain psychological records, which the City claimed were privileged. At a discovery conference, the trial judge directed the parties to draft a scheduling order according to certain "guidelines," one of which was that the City produce the records. The City failed to produce the records and, apparently because of its failure, was ordered to pay a $1000 sanction. The City did eventually produce the records.
 
 
 26
 The second order came as a result of the City's failure to produce a tape of another Post interview, this one of the Chief of Police. The City claimed that the tape could not be located, and the trial judge, at another discovery conference, granted the plaintiff permission to depose "city employees" concerning the whereabouts of the tape. Pressey gave notice of his intention to depose several persons. Shortly thereafter, the City produced the tape of the Chief of Police's interview along with an affidavit explaining why it had not been produced before. The City then took the position that the other depositions would be a futile exercise since the tape had been found.
 
 
 27
 Although the City unquestionably failed to cooperate with the spirit of the court's discovery orders, and indeed had suffered one sanction for this already, we find no instance in which the City directly and in bad faith disobeyed a direct court order to produce specific evidence.
 
 
 28
 (b) Delay and Evasiveness
 
 
 29
 Pressey also contends that the City followed a pattern of delaying its discovery responses as long as possible and then giving evasive or inaccurate reasons for its failure to produce. We have carefully reviewed Pressey's claims in this respect and conclude that the record does not support a conclusion the City engaged in bad faith tactics or willful abuse of the judicial process.
 
 C. The Propriety of the Sanction
 
 30
 As noted above, we review the sanction under an abuse of discretion standard. After our review of the record, we are persuaded that the trial court abused its discretion in imposing such a severe sanction.
 
 
 31
 The incidents of discovery misconduct, taken separately or together, do not support the conclusion that the City was in bad faith or that it willfully abused the judicial machinery. Moreover, less severe sanctions were available that were more appropriately tailored to the misconduct. We therefore reverse the trial court's order striking the City's answer for discovery abuse and remand the case for trial on the issue of liability.
 
 
 32
 While we conclude that the sanction imposed was too severe, some sanction is certainly justified. The City unquestionably behaved improperly in the discovery phase of this case. On remand, the trial court may consider other, more appropriate sanctions. The evidence certainly supports an inference that the City was negligent or even reckless in failing to take sufficient measures to retain the tapes; based on this, the trial court may wish to sanction the City by deeming the facts reported in the Post article admitted by the City. Additionally, the judge may consider monetary penalties as a sanction for the City's other misconduct.
 
 III.
 A. Scope of the Trial on Remand
 
 33
 In view of our remand of the case for a trial on liability, we next consider whether we should require a new trial on damages as well. If the liability and damages issues are sufficiently independent, we may direct a new trial on liability while preserving the damages awards from the earlier trial. See Akermanis v. Sea-Land Service, Inc., 688 F.2d 898, 906 (2d Cir.1982), cert. denied, 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983). We are persuaded that the liability and damages issues are sufficiently independent to preserve the jury's findings on damages. If in the new liability trial the jury finds the city liable, the elements of recoverable damages will be identical to those considered by the jury in the first trial. In other words, except in the sense that the plaintiff will recover no damages unless he prevails on liability issues, the question of damages is entirely independent of the question of liability. We conclude therefore that the jury's determination of damages should stand to the extent that it is not excessive.
 
 B. The Damages Awards
 
 34
 The jury awarded compensatory damages in various categories totalling over $6.7 million.[6] The jury declined to award punitive damages. The City now attacks the jury's award as excessive in a number of categories: (i) past and future pain and suffering; (ii) past and future anguish, disfigurement, and physical impairment; (iii) past and future lost earnings; and (iv) past and future personal care. A jury's assessment of damages is entitled to great weight, but we may reduce the award when it "clearly exceeds that amount [to which] any reasonable man could feel the claimant is entitled...." Bridges v. Groendyke Transport, Inc., 553 F.2d 877, 880 (5th Cir.1977).
 
 
 35
 Before reviewing the individual items, we will give a brief overview of Pressey's injury and how he has progressed since October 1983. Pressey was thirty years of age at the time of the incident. The gunshot wound destroyed a portion of his skull and brain. Pressey underwent immediate brain surgery and was placed in an intensive care unit for about one month. Pressey was then transferred to a rehabilitative unit. Although he began to regain some functional abilities, such as walking, he suffered judgmental deficiencies, memory loss, spatial disorientation, and difficulty controlling the left side of his body. He also began to suffer seizures. Pressey's IQ was tested during this period and it had dropped from approximately 120 to about 80. He had an obvious disfigurement on his forehead.
 
 
 36
 Pressey returned home and was primarily cared for by his mother. He could walk and perform some tasks for himself, but he was unable to drive or work. His seizures continued although he took two strong anticonvulsants. He continued to have impaired judgment, impaired memory, impaired control of his left side, and spatial disorientation. Pressey also suffered headaches and neck pain. About a year before the trial, Pressey's IQ was again tested and was found to have dropped to 73. Reconstructive surgery repaired much of the disfigurement, but some scarring remained.
 
 
 37
 The City first charges that the $750,000 for past pain and the $250,000 award for future pain are unjustified. The evidence shows that Pressey was conscious upon his arrival at the emergency room immediately after the shooting. As a result of the wound he was forced to undergo two surgeries, immediate brain surgery and later reconstructive surgery. There is some possibility that he will have to undergo further reconstructive surgery. Pressey suffered temporary paralysis, shaking in his limbs, and high fevers as a result of his wound. Pressey also suffered painful seizures despite his taking strong anticonvulsants. The record shows that these seizures came at least once every three weeks and as frequently as twice a week.[7] Pressey also continues to suffer headaches and neck pain. Based on this record, we cannot say that a $750,000 award for past pain and a $250,000 award for future pain were beyond reasonable limits.
 
 
 38
 The City next attacks the $500,000 award for past and the $1,000,000 award for future anguish, disfigurement, and physical impairment. The testimony indicated that Pressey suffered substantial anguish, including depression and nightmares, as a result of the radical change in his lifestyle. Pressey also had an obvious disfigurement before reconstructive surgery, and some scarring remained even after the surgery. Pressey's left side reaction and motor function are permanently impaired. He will also continue to suffer spatial disorientation. The brain damage he suffered caused a loss of a substantial part of his intelligence. Pressey's pre-accident intelligence was estimated as "bright normal," or an IQ as high as 120. After the accident, Pressey was at the lower end of the "dull normal range," with an IQ measured once as 80 and once as 73. This record supports the award for past and future anguish, disfigurement, and physical impairment.
 
 
 39
 The next elements challenged by the City are the lost past earning capacity of $72,100 and $930,000 lost future earning capacity. The City contends that the jury erroneously predicated its award on the average earnings of college graduates and wholesale tradesmen. The City acknowledges that Pressey had a college degree, but notes that he had been running his own business for about three years and had not shown a profit during that time.
 
 
 40
 There was evidence that the economic outlook for Pressey's business was good and that Pressey was ambitiously pursuing his business and devoting substantial personal effort to making it successful. However, there was simply no evidence that he derived any income from the business or that the business earned a profit. He filed no tax returns for this period. See, e.g., T.J. Allen Distributing Co. v. Heatherwood, 648 S.W.2d 773, 774-75 (Tex.Ct.App.1983). Under these circumstances, we must remit the entire award for past lost earnings. However, as far as future earnings are concerned, we think the jury was entitled to conclude that within the four and one-half years that elapsed between the accident and trial, Pressey would have either succeeded as an entrepreneur or would have taken a job at the salary of a college graduate or wholesale tradesman. In either case, the jury could reasonably consider the projected earnings of a college graduate or wholesale tradesman. We therefore decline to disturb the award for loss of future earning capacity.
 
 
 41
 Finally, the City attacks the jury's award for past and future personal care. The City argues that the jury's $250,000 award for past medical care was excessive because it was based on the rate paid to trained medical personnel, while Pressey's mother, who had no medical training, actually provided the care. The City concedes that Pressey was entitled to recover for his mother's services for the four-year, five month period between his release from the hospital and the time of the trial, but argues that the jury calculated the value of the services based on the cost of twenty-four hour care by trained medical caregivers rather than by calculating the actual value of Mrs. Pressey's services. Mrs. Pressey, who was not a trained caregiver, testified that she spent no more than four and one-half hours per day actually providing services for her son. Recognizing that she was required to be on hand at times when she was not actually giving care, we nonetheless cannot say, based on this record, that she was entitled to recover for any more than eight hours service per day. The testimony showed that the maximum wage for unlicensed medical care was ten dollars per hour. Hence, we conclude that the plaintiff was not entitled to more than $128,000 for Mrs. Pressey's services. We therefore order a remittitur of $122,000 of the jury's award for past personal care.
 
 
 42
 We conclude, however, that the evidence supports the jury's $2,500,000 award for future personal care. Several experts predicted that Pressey would not make a good recovery. The plaintiff's medical expert detailed the expected expenses of Pressey's medical care assuming that he did not make a good recovery. She noted that Pressey should undergo up to two years of rehabilitation at a maximum cost of $144,000 per year. After rehabilitation, she noted, Pressey would still require an attendant twenty-four hours a day for the rest of his life, which could cost as much as $4,000 per month. The plaintiff's economist calculated the present value of the attendant hired at this cost at $2,252,000.
 
 
 43
 The City argues that by making the award it did, the jury accepted the plaintiff's expert's "worst-case scenario." On this record, we believe the jury was entitled to believe that Pressey's condition and chances of recovery matched this "scenario" and therefore that he would need the care outlined by the plaintiff's expert. Since the figures given by the plaintiff's medical and economic experts support the award given, we decline to disturb it.
 
 C. Calculation of Prejudgment Interest
 
 44
 The trial judge awarded prejudgment interest but refused to calculate interest according to Texas law. Pressey argues that Texas law requires that the prejudgment interest be calculated differently.
 
 
 45
 A recent case from this circuit held that state law governs the calculation of prejudgment interest in section 1983 claims. In Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir.1985), we remanded a section 1983 case to allow the trial court "to consider the applicability of the recent Texas Supreme Court's decision on prejudgment interest." Id. at 173. The trial judge did award prejudgment interest according to Texas law, and a second appeal followed. Grandstaff v. City of Borger, 846 F.2d 1016 (5th Cir.1988). On the second appeal, this court relied on Texas law in reviewing the allowance of prejudgment interest. Hence, in this circuit at least, state law governs the calculation of prejudgment interest in section 1983 claims. If liability is imposed on remand and the damage award reinstated, the district court shall calculate prejudgment interest under Texas law.
 
 IV.
 
 46
 The City also appeals the district court's award of attorneys' fees. Since we have reversed the ruling upon which the liability of the City was based, the plaintiff cannot be a prevailing party, and the award of attorneys' fees must fall. See Turner v. McMahon, 830 F.2d 1003, 1009 (9th Cir.1987), cert. denied, --- U.S. ----, 109 S.Ct. 59, 102 L.Ed.2d 37 (1988); Ladnier v. Murray, 769 F.2d 195, 200 (4th Cir.1985); Harris v. Pirch, 677 F.2d 681, 689 (8th Cir.1982). Whether Pressey "ultimately becomes the prevailing party is a matter [that] must await further developments." Ziegler v. Ziegler, 632 F.2d 535, 539 (5th Cir.1980). Consequently, we need not now consider this issue.
 
 V.
 
 47
 W.L. Brasher also appeals. Brasher points out that the summary judgment establishing liability against him was grounded on his criminal conviction. His conviction, however, was not based on the actual shooting but instead on the cover-up that followed the shooting. He argues that he is liable at most for those damages resulting from the cover-up, not for damages stemming from the shooting itself. Because Pressey offered no evidence at trial of damages flowing from the cover-up, Brasher contends he should be exonerated.
 
 
 48
 Brasher has waived this argument. Brasher's attorney argued to the jury that he was "not going to quarrel with full compensatory damages to Mr. Pressey," and later that he was "not going to dispute full compensatory damages to that man." Brasher requested no special interrogatory seeking a breakdown of damages caused by the shooting versus damages caused by the cover-up. The trial judge had no notice that Brasher wished to raise this issue. Brasher's attorney's entire trial presentation reveals that he was seeking only to avoid punitive damages against his client. Under these circumstances, he conceded his client's liability for all compensatory damages that were proven. See, e.g., Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, 729 F.2d 1530, 1549 (5th Cir.1984); Smith v. Hearod, 498 F.2d 663, 665 (5th Cir.1974). Hence, we will not consider Brasher's argument.
 
 
 49
 For the reasons stated above, this case is affirmed in part, modified in part, reversed in part and remanded for further proceedings consistent with this opinion.
 
 
 50
 AFFIRMED in part, MODIFIED in part, REVERSED in part and REMANDED.
 
 
 
 [1]
 Both were convicted on charges stemming from the violation of Pressey's civil rights. See United States v. Patterson, 809 F.2d 244 (5th Cir.1987)
 
 
 [2]
 Because striking the pleadings of a defendant and rendering default judgment is equally as harsh a sanction as dismissing the case of a plaintiff with prejudice, we cite cases involving these sanctions interchangeably
 
 
 [3]
 Pressey questions the actual date of the destruction of the tapes. The only evidence in the record is the deposition of Reiser, in which he sets the date of destruction as late December 1986 or early January 1987. We find nothing in the record to suggest that the tapes were destroyed at any other time, and therefore we will accept the fact that the tapes were destroyed sometime in that period
 
 
 [4]
 Although the question is not directly before us, we have strong doubts whether the trial judge was correct in enforcing this privilege insofar as these tapes were concerned. As far as we can discern from the record, Reiser was a divulged source, not a confidential source. Moreover, Reiser expressly waived the privilege
 
 
 [5]
 We have sometimes considered prejudice when reviewing severe sanctions for discovery abuse. See, e.g., Batson v. Neal Spelce Associates, Inc., 765 F.2d 511, 514 (5th Cir.1985). In this light, we note that since the tapes had been destroyed long before the misrepresentations were made, Pressey suffered little or no prejudice. We do not mean to suggest that parties can escape sanction for making misrepresentations to a court simply because no prejudice results; we say only that where a misrepresentation that is not shown to be intentional results in no harm to the other party, extremely severe sanctions are not warranted
 
 
 [6]
 Damages awarded in the verdict were as follows:
 a. Past pain $ 750,000
b. Future pain 250,000
c. Past anguish, disfigurement, and physical impairment 500,000
d. Future anguish, disfigurement and physical impairment 1,000,000
e. Past medical expenses 55,059.91
f. Future medical expenses $269,600
g. Past value of personal care 250,000
h. Future cost of personal care 2,500,000
i. Past lost earning capacity 72,100
j. Future lost earning capacity 930,000
k. Past guardianship expenses 4,636
l. Future guardianship expenses 120,000
m. Property damage 3,100
 
 
 [7]
 The City presented expert testimony that seizures could be controlled in eighty-five percent of the cases with a drug known as "Tegretol." However, other experts testified that Pressey's seizures would be difficult to control, even with Tegretol. One expert testified that Tegretol could not stop Pressey's seizures, but could at most help control them somewhat. Also, another expert presented a study that victims of head wounds such as Pressey's had a fifty percent probability of continuing to have seizures once they had begun having them regardless of the medication used. Given the conflicting state of the evidence on Tegretol and the fact that two anticonvulsants had not helped Pressey, the jury was entitled to conclude that he would continue to have the seizures even if he began taking the drug