Carolee Brady HARTMAN,
et al., Plaintiffs,

v.

Joseph DUFFEY, Defendant.

Civ. No. 77–2019(JR).

United States District Court,
District of Columbia.

June 24, 1997.

---

Mindy A. Kaiden, Steptoe & Johnson, L.L.P., Washington, DC, Bruce Allan Fredrickson, Jeffrey E. Fallon, Webster & Fredrickson, Washington, DC, Peter H. Doyle, Arter & Hadden, Washington, DC, David L. Rose, Washington, DC, Douglas Benjamin Huron, Heller, Huron, Chertkof, Lerner, & Salzman, Washington, DC, for plaintiffs.

Stefania M. Porcelli, U.S. Atty. Office, Washington, DC, Robert Lawrence Shapiro, Spriggs & Hollingsworth, Washington, DC, for defendant.

## MEMORANDUM OPINION

ROBERTSON, District Judge.

This class action involves gender-based employment discrimination in the promotion and hiring practices of the United States Information Agency ("USIA" or "agency"), in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Judge Charles R. Richey, who presided over the case for just over twenty years until his death on March 19, 1997, bifurcated it into a liability stage and a relief stage.

During the liability stage, Judge Richey determined that, from October 8, 1974 through November 16, 1984, the defendant engaged in a system-wide pattern and practice of gender-based employment discrimination. The case then proceeded to the relief stage. In that stage, each member of the plaintiff class is entitled to a *"Teamsters* hearing," *see International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), to determine her entitlement to relief and the scope of that relief.

Judge Richey appointed a Special Master to conduct the *Teamsters* hearings. The Special Master, Stephen A. Saltzburg, has completed hearings for a number of individual claimants and has filed his reports pursuant to Fed.R.Civ.P. 53. The parties have filed numerous objections to the reports.

A hearing was conducted May 16, 1997 on objections to six of the reports, as to claimants Dilara Hashem, Musarrat Burkie, Lynn Goldman Bartlett, Judith Ambrose, Carolyn Turner, and Wai–Soo Wong Koo. The Court's rulings on those six reports are set forth below.

## DISCUSSION

 A Special Master's findings of fact in a non-jury action are to be accepted unless they are clearly erroneous. Fed.R.Civ.P. 53(e)(2). This deferential standard is the same as that governing appellate review of district court findings. *Oil Chemical & Atomic Workers Int'l Union, AFL–CIO v. NLRB,* 547 F.2d 575, 580 (D.C.Cir.1976), *cert. denied,* 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977). A Special Master's conclusions of law are reviewed de novo. *Id.*

 The burden of demonstrating that a Special Master's factual findings are clearly erroneous falls upon the objecting party. *Id.* A finding is clearly erroneous if it is without substantial evidentiary support or was induced by an erroneous application of the law. *Cuddy v. Carmen,* 762 F.2d 119, 123 (D.C.Cir.), *cert. denied,* 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985). A reviewing court may set aside a finding if, based on the entire record, with due regard for the Special Master's opportunity to judge credibility, the court is left with the definite and firm conviction that a mistake has been made. *Oil, Chemical & Atomic Workers,* 547·F.2d at 580. In the absence of clear error, however, a Special Master's findings must be affirmed, even if the Court thinks they are against the weight of the evidence, *Case v. Morrisette,* 475 F.2d 1300, 1307 (D.C.Cir.1973), or is convinced that it would have decided the case differently, *Cuddy,* 762 F.2d at 123. The clearly erroneous standard applies even when factual findings do not rest on credibility determinations but are based on physical or documentary evidence or inferences from undisputed facts. *Oil, Chemical & Atomic Workers,* 547 F.2d at 580. The standard does not depend upon whether a fact is characterized as "subsidiary" or "ultimate." *See Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).

 After a hearing, the court may adopt the report of the Special Master, modify it, reject it in whole or in part, receive further evidence, or recommit it to the Special Master with instructions. Fed.R.Civ.P. 53(e)(2).

The parties' objections to the six reports under review involve discovery issues, liability issues, and damages issues. Defendant's objections on discovery issues will be overruled. The Special Master carefully considered the arguments of the parties, rejecting proposals of both parties in order to achieve the just and efficient resolution of the claims in this case. Defendant's claim of unfair surprise is without merit.

The liability issues are treated below. The damages issues will be addressed in a later opinion, after further hearing.

### A. *Burdens of proof in the Teamsters hearings*

Defendant objects to the Special Master's analysis of a claimant's burden of proof and of the standard applicable to defendant's showing of legitimate, non-discriminatory reasons for a rejection or a failure to hire.

### (1) *Claimant's burden of proof*

The law governing a claimant's burden of proof at the post-liability remedial stage of a class action pattern and practice discrimination case was established by *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

> The [plaintiff] need only show that any alleged individual discriminatee *unsuccessfully applied for a job* and therefore was a potential victim of the proved discrimination.

431 U.S. at 362, 97 S.Ct. at 1868 (footnote omitted) (emphasis added). Judge Richey's

January 19, 1988 opinion in this case quoted that passage in describing an individual claimant's burden of proof. *Hartman,* 678 F.Supp. at 333. In his order of reference, issued with the January 19, 1988 opinion, Judge Richey wrote:

> [E]ach claimant.. must prove ... by a preponderance of the evidence, *that she applied for a position at issue in this suit during the time period relevant to this suit and that she was rejected for that position.*

678 F.Supp. at 345 (emphasis added). In a subsequent order denying defendant's motion for reconsideration, Judge Richey quoted the *Teamsters* opinion again and ruled that a claimant's burden was to show that she "unsuccessfully applied for a job." *Hartman v. Wick,* No. Civ. Act. 77–2019, 1988 WL 39856, at *1 (D.D.C. Apr.15, 1988).·

■ Defendant, focusing only on the language of Judge Richey's order of reference, argues that proof of an "unsuccessful application" is not enough. Defendant insists that a claimant must prove *both* that she applied for a position *and* that the agency considered and rejected her application. The argument is that, unless the fact of the agency's considered decision to reject her application is proven, it cannot be assumed that the agency made a determination not to hire her—that without proof of rejection it would be just as likely that her application was lost or never acted upon.

The answer to this question does not rely upon whether the language of Judge Richey's order of reference trumps the language of his other two orders, but rather on the reasoning of Judge Richey's orders and of the *Teamsters* decision. In *Teamsters,* the Supreme Court reasoned:

> [T]he finding of a pattern or practice chang[es] the position of the employer to that of a proved wrongdoer. *[T]he employer [is] in the best position to show why any individual employee was denied an employment opportunity.* ... [T]he company's records [are] the most relevant items of proof.

431 U.S. at 359 n. 45, 97 S.Ct. at 1867 n. 45 (emphasis added). Judge Richey's ruling proceeded from that reasoning:

Because it is impossible to recreate the process that led to rejection of a plaintiff's employment application, *all doubt must be resolved against the proven discriminator rather than the innocent applicant.* Thus, if there is any uncertainty about the actual reason that defendant rejected a claimant's employment application, that doubt must be resolved against the defendant.

678 F.Supp. at 335 (citations and internal quotations omitted) (emphasis added). Just as the employer is in the better position to show why an applicant was rejected, so the employer is in the better position to support the factual proposition that an applicant was not rejected. To hold otherwise would throw upon a claimant the burden of showing what was in defendant's files, and such a result is flatly inconsistent with the Supreme Court's approach in *Teamsters.*

Defendant may wish, in a specific case, to show that an application was never acted upon because it was received too late, or (after establishing that its files were complete) that an application was never received at all, but the burden of adducing proof of such facts must rest upon defendant, especially where, as in this case, many of the necessary files have been destroyed by defendant. As Judge Richey put it,

> [Defendant] has not retained applicant files for most of the ten-year period at issue in this suit. While the Court has not subjected defendant to penalty because of this routine destruction of files, it cannot allow the lack of information resulting from defendant's practices to affect the legal requirements governing this suit. If the defendant-discriminator faces difficulties, they are difficulties of his own making, and the law cannot penalize the innocent victims of his discrimination simply in order to ease his tasks.

*Hartman,* 1988 WL 39856, at *2.

■ A claimant may sustain her burden by showing that she applied for a job during the relevant time period and that she was unsuccessful in her application. That showing entitles her to the rebuttable presumption that she was indeed rejected, and that the rejection was because of discrimination.

### (2) *Defendant's standard of proof*

Judge Richey's order of reference provided that defendant could overcome the presumption of discriminatory rejection, once a claimant has sustained her burden of proving an unsuccessful application, only by clear and convincing evidence of a legitimate, non-discriminatory reason for rejecting the application. *Hartman*, 678 F.Supp. at 345. That "clear and convincing" standard, when it was issued, rested on well-established law. *See Trout v. Lehman*, 702 F.2d 1094, 1107 (D.C.Cir.1983), *vacated on other grounds*, 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984); *McKenzie v. Sawyer*, 684 F.2d 62, 78 (D.C.Cir.1982); *Harrison v. Lewis*, 559 F.Supp. 943, 946 (D.D.C.1983). *See Day v. Mathews*, 530 F.2d 1083, 1085–86 (D.C.Cir. 1976); *Trout v. Garrett*, 780 F.Supp. 1396, 1404 (D.D.C.1991).

After the order of reference was issued, however, the Supreme Court decided *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), which has been interpreted to assign only a "preponderance of the evidence" standard to the employer's burden of proving a non-discriminatory reason. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1219–20 & n. 18 (5th Cir.1995). *Cf. Craik v. Minnesota State University Bd.*, 731 F.2d 465, 470 n. 8 (8th Cir.1984); *Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 548 (6th Cir.1989); *Sledge v. J.P. Stevens & Co.*, 585 F.2d 625, 637 (4th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979). *Price Waterhouse* was not a pattern and practice case, but its rule governs this case and requires, in effect, a *post hoc* amendment of the order of reference to provide that the defendant's proof is to be measured by the preponderance, not the clear and convincing, standard.

\* \* \*

With the appropriate burdens of proof in mind, the Court will now turn to the Special Master's findings.

### B. *The Special Master's Liability Findings*

#### (1) *Dilara Hashem*

The Special Master concluded that the agency unlawfully discriminated against Dilara Hashem in 1975, when she unsuccessfully applied for a position as an international radio broadcaster in the Bengali service of the Voice of America ("VOA"). The Special Master awarded Ms. Hashem back pay in the amount of $222,754. Defendant objects to the liability findings on the grounds (i) that Ms. Hashem failed to sustain her burden of proving that she unsuccessfully applied and (ii) that in any case the defendant proved a legitimate, non-discriminatory reason for not hiring Ms. Hashem.

On the first point, the parties agree that Ms. Hashem prepared and submitted a standard government form SF–171 in 1972, when she was hired as a purchase order vendor with VOA, and that she filled out another SF–171 when she applied for a position in 1980. Report at 6 & App. A. The parties also agree the Ms. Hashem did not file an SF–171 in 1975, when the international radio broadcaster position was open and filled. Report at 6. The defendant's submission is that Ms. Hashem's failure to submit an SF–171 in 1975 precludes a finding that she in fact applied for the position.

The Special Master found, however, that males successfully applied for foreign language broadcaster positions in the same manner as Ms. Hashem did in 1975. Findings 21, 22, 27, 29, 31, 32, 34, 35, 39, 42, 43; Ishtiaq Ahmed Test., Tr. 6/10/96, at 161–62; Baker Test., Tr. 6/11/96, at 49; Harrison Test., Tr. 6/12/96, at 9, 59–60, 67, 70–72, 74–79, 122; Pl. Exh. 31, 33, 35, 36, 65, 66, 71. He found further that, after Ms. Hashem had completed the formalities of applying to the agency in 1972, she was told by the Division Administrative Officer that the agency could offer her a position after routine administrative clearances. Findings 3–4; Hashem Test., Tr. 6/10/96, at 36–39, 44; Harrison Test., Tr. 6/12/96, at 31; Pl. Exh. 3, 4, 51. The Special Master found further that Ms. Hashem made repeated oral and written inquiries about open positions to numerous hiring officials, *see* Findings 10–14; Hashem Test., Tr. 6/10/96, at 45–50; Ishtiaq Ahmed Test., Tr. 6/10/96, 123–25; Harrison Test., Tr. 6–12–96, at 31–32, 37, but that each time

she inquired about jobs in the Bengali Service, she was told that there were no vacancies. No vacancy announcements were posted, yet four men were hired as Bengali broadcasters. Findings 22, 38, 39; Hashem Test., Tr. 6/10/96,. at 51–52; Cooke Test., Tr. 6/17/96, at 55. *See Taylor v. Western and Southern Life Ins. Co.,* 966 F.2d 1188, 1198 (7th Cir.1992) (affirming trial court finding that plaintiff applied for a promotion by making telephone call to her supervisor expressing interest, and rejecting defendant's claim that more formal application necessary); *EEOC v. A.S.G. Inc.,* 54 Fair Empl. Prac. Cas. (BNA) 1417, 1419, 1990 WL 284505 (S.D.Ohio 1990) (plaintiff applied for job by making a telephone inquiry, thereby following the exact same procedure as male applicants); *Paxton v. Union National Bank,* 688 F.2d 552, 568 (8th Cir.1982) (plaintiff met application requirement by demonstrating that defendant was on notice of his interest, where vacancy not posted and plaintiff only learned of vacancy after position filled), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); *EEOC v. Metal Serv. Co.,* 892 F.2d 341, 348–50 (3d Cir.1990).

 The Special Master's conclusion was that:

> [u]nder any standard—preponderance of the evidence, clear and convincing evidence, and even proof beyond a reasonable doubt—the evidence demonstrates Dilara Hashem applied for employment in 1975 with VOA, and VOA was aware of her application.

Finding 43. The finding that Ms. Hashem unsuccessfully applied for a position as a Bengali broadcaster is supported by substantial evidence, and the defendant's objection will be overruled.

Defendant's objection to the finding that the agency failed to prove a non-discriminatory reason for not hiring Ms. Hashem will also be overruled. One witness, Allan Baker, testified that "[d]uring Ms. Hashem's tenure as a Purchase Order Vendor, Ms. Hashem became a disruptive influence in the Bengali Service," and that "she provoked a serious tense situation between herself and a female member of the staff," but the Special Master found this testimony unsupported by the evidence. Findings 64, 71. Co-workers did not believe that Ms. Hashem caused any significant problems of disruption. Finding 70; Iqbal Ahmed Test., Tr. 6/11/96, at 218–20. The Special Master found that any problems with Ms. Hashem were not serious and would not have precluded the agency from hiring Ms. Hashem. Findings 71, 73, 79. Moreover, the Special Master found the defendant's "disruptiveness" defense fatally undercut by the fact that defendant did hire Ms. Hashem in 1980. Finding 80. The Special Master's use of the clear and convincing standard was not decisive on this issue of disruptiveness, in view of his observation that he would "reject the defenses that she was not hired because she was disruptive and a more qualified candidate was hired as *completely lacking evidentiary support.*" See Final Report of Special Master Regarding 1976–1977 Claim of Etel Genes Berger ["Berger Report"], at n. 15 (emphasis added). Any error in the Special Master's allocation of the defendant's burden of proof was harmless.

The liability findings of the Special Master with respect to Dilara Hashem will be affirmed.

### (2) *Musarrat Burkie*

 The Special Master concluded that the agency unlawfully discriminated against Musarrat Burkie in 1984 when it denied her a position as a international radio broadcaster in the Urdu service of the VOA. The Special Master awarded back pay in the amount of $716,379 and ruled that Ms. Burkie is entitled to a hiring priority and front pay until she is hired. Defendant concedes that Ms. Burkie applied for the position but objects to the finding of failure to prove a non-discriminatory reason, namely, that her voice audition was unacceptable.

The Special Master's Final Report rested upon the "clear and convincing" standard with respect to the defendant's proof, but the Special Master found that the defendant did "not come close" to meeting that standard. Report at 61. Later, the Special Master revisited his findings:

I found with respect to the claim of Musarrat Burkie that the Defendant had not come close to proving a defense, and I pointed to the false testimony and missing records which undermined the Defendant's case. I would have found that Defendant had failed to meet even a preponderance standard on the facts presented.

Berger Report, at n. 15. A review of the record shows ample support for that conclusion.

The defendant's failure to prove his defense was attributable in large measure to the agency's unexplained destruction of Ms. Burkie's original test file—before the expiration of the agency's normal record retention period, after the entry of the court's liability opinion, after the individuals responsible for maintaining test records were aware of the importance of preserving the records, after notice from the claimant that she was challenging her test results, and while timely discovery requests for the test files were pending. Report at 10–18. The agency's destruction of Ms. Burkie's test files justified drawing adverse inferences against the defendant, Report at 15–18, and left the defendant with no reliable documents to prove that she failed the test. Report at 17, 30–34. The reliability of the evidence defendant did submit was questionable in light of evidence of fraud and procedural irregularities—including the alteration of test scores—in the Urdu Service. Report at 18–30, 62. Defense witnesses had no independent recollection of Ms. Burkie's examination. Report at 35–36. Two of them testified falsely on important issues relating to Ms. Burkie's voice test and the Urdu Service examination process, seriously undermining their credibility. Report at 49, 62.

Defendant's challenge is to the adverse inferences and credibility determinations made by the Special Master. Relying on a footnote found in *Hartman v. Wick,* 678 F.Supp. 312, n. 11 (D.D.C.1988), defendant suggests that Judge Richey precluded the drawing of adverse inferences from the agency's destruction of records. Judge Richey did not go nearly so far, however. He merely declined to find bad faith in the defendant's destruction of documents on the evidence before him at the time of his order. The drawing of adverse inferences from the document destruction that took place with respect to Ms. Burkie is warranted in light of the evidence supporting its purposeful nature. *Accord Nation–Wide Check Corp., Inc. v. Forest Hills Distrib., Inc.,* 692 F.2d 214 (1st Cir.1982) (Breyer, J.) (district court did not err in drawing adverse inference in absence of bad faith when document destruction was not merely negligent but purposeful); *Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148 (4th Cir.1995) ("While a finding of bad faith suffices to permit such an inference, it is not always necessary."); *Glover v. BIC Corp.,* 6 F.3d 1318 (9th Cir.1993); *Pressey v. Patterson,* 898 F.2d 1018 (5th Cir. 1990); *see Rice v. United States,* 917 F.Supp. 17 (D.D.C.1996) (Robinson, M.J.) (adverse inference permitted on finding of gross indifference or reckless disregard). The Special Master's liability findings regarding Ms. Burkie are amply supported in the record and are not clearly erroneous.

### (3) *Lynn Goldman Bartlett*

█ The Special Master concluded that the agency discriminated against Lynn Goldman Bartlett in 1980 when it denied her a position as a radio broadcast technician in the Washington plant of the VOA. The Special Master awarded back pay in the amount of $562,481, and ruled that Ms. Bartlett is entitled to a hiring priority and front pay until she is hired. Defendant's objection is to the Special Master's finding that Ms. Bartlett sustained her burden of proving that she made an unsuccessful application.

The Special Master found, based largely on Ms. Bartlett's testimony, that she applied to the agency by mailing her application in the same envelope as that of Mr. Goldman, her former husband who is now deceased. Findings 1–7; Bartlett Test., Tr. 7/8/96, at 53. Ms. Bartlett's testimony was corroborated by other testimony and by documentary evidence, *see* Doye Test., Tr. 7/8/96, at 175–76; Pl. Exh. 1, and the Special Master found her specific recollection credible, particularly because

she and her husband had worked together in the recording studio business, and . . .

they both had decided to attempt a career move, and to do it together: *i.e.,* to move from California, give up their private work, and work for USIA in Washington, D.C. They contacted the agency together, they sought help from their Congressman together ..., they filled out their forms in concert ..., and they went together to mail an envelope which contained the forms that they hoped would result in a change of cities, jobs and coasts. It was a momentous occasion, and not surprisingly it was a memorable one.

Finding 8; Bartlett Test., Tr. 7/8/96, at 82. Defendant's Exhibit 13 contained a statement made by Ms. Bartlett only two years after the fact and long before this Court's finding of liability: "When my husband applied to the Voice of America for his position, I also applied for a position by forwarding my 171 along with his 171." Finding 17; Def. Exh. 18. That document also detailed Ms. Bartlett's subsequent inquiries for a job at the VOA and was entirely consistent with her testimony. Finding 18. The Special Master declined to accord much significance to the fact that Ms. Bartlett was unable to produce a copy of her SF–171, finding it "hardly surprising that a copy of a 1980 document was unavailable some eight years later following a trans-continental move, several moves within Washington, D.C., marital separation, a divorce, and the pursuant of a new career." Finding 27. The Special Master concluded that "there is no doubt that Ms. Bartlett applied for a position with USIA in 1980." Finding 31. That conclusion is supported by substantial evidence in the record.

*(4) Judith Ambrose*

■ The Special Master concluded that the agency discriminated against Judith Ambrose in 1976 when it denied her a position as a radio broadcast technician. He awarded Ms. Ambrose back pay in the amount of $565,902 and directed that she be promoted to an appropriate grade and step level, as she is a current USIA employee. Defendant asserts that Ms. Ambrose did not prove the fact of her unsuccessful application by a preponderance of the evidence and asserts further that the agency proved that Ms. Am-

brose lacked minimal qualifications for the position.

The defendant first argues that gaps in Ms. Ambrose's recollection prevent her from proving the fact of her unsuccessful application. Ms. Ambrose could not produce a copy of an application to the agency. Finding 1. She testified that in 1976 she applied for many positions that she had learned about in trade magazines and newspapers and from friends and colleagues, Finding 4, but she did not recall specifically the other employers to whom she applied, Finding 5.

The Special Master did not find it surprising that Ms. Ambrose recalled her application to VOA but did not recall her other applications, in light of other testimony from which he concluded that working for VOA is "for many people reaching the pinnacle of the profession." Finding 5; Ostergard Test., Tr. 7/30/96, at 258.

The Special Master also found that Ms. Ambrose's claim to have made application was corroborated by circumstantial evidence. In 1976, Ms. Ambrose's previous broadcasting job had just ended, and she would have been anxious to apply for another position in broadcasting. Finding 9. Seven years before her *Teamsters* hearing, Ms. Ambrose recited on her claim form that she was not hired because the agency purportedly had found someone more qualified, with more broadcast experience. Finding 10; Court's Exh. A. That recitation was consistent with her testimony at the *Teamsters* hearing and with the testimony of an agency hiring official who confirmed that the practice of the agency was to send rejection letters saying that "other applicants were more qualified." Finding 11; Ambrose Test., Tr. 7/29/96, at 117; Holland Test., Tr. 7/30/96, at 193.

The Special Master made careful findings as to witness credibility and explained his inferences thoroughly. His finding that Ms. Ambrose unsuccessfully applied in 1976 will not be disturbed.

■ The Special Master went on to find that

[t]here is no way to know exactly what happened when Ms. Ambrose filed her ap-

plication in 1976.... The Defendant is required to prove the defense set forth, namely that Ms. Ambrose would have been rejected because she lacked minimal qualifications in 1976. There is no credible evidence to support this defense.

Report at 38–39; *see also* Berger Report, at n. 15 ("My findings indicated that she did have the minimum qualifications, and thus she would have prevailed even [if] she had the burden of disproving the defense as to her claim"). Robert Holland, a personnel management specialist employed by the agency from 1963–1987, testified after reviewing Ms. Ambrose's 1985 SF–171 that he would not have considered her minimally qualified to be hired as a radio broadcast technician. Finding 24; Holland Test., Tr. 7/30/96, at 196–97. However, as the Special Master noted, the 1985 SF–171 was an application to be a *television* technician and it highlighted the experience Ms. Ambrose advanced as relevant to that application. Finding 26–27. Her 1976 application was for a *radio* broadcast technician position, and the Special Master found that "there is virtually conclusive evidence that Mr. Holland would have found her qualified." Finding 32. That finding was based upon Mr. Holland's answers to a series of questions that were designed to present him with a hypothetical candidate whose experience paralleled that of Ms. Ambrose, Finding 70; upon a comparison of Ms. Ambrose's work history with the agency's Recruitment Bulletin for radio broadcast technicians, Findings 73–79; Pl. Exh. 1; and upon a comparison of Ms. Ambrose's qualifications with those of persons found minimally qualified or hired by the agency, Findings 80–90.

### (5) *Carolyn Turner*

■ The Special Master concluded that the agency unlawfully discriminated against Carolyn Turner in 1977 when it denied her a position as a production specialist. The Special Master awarded back pay in the amount of $853,044 and ruled that Ms. Turner is entitled to the establishment of a retirement account as if she had been hired as of January 1, 1978 and to front pay until she is hired, with seniority retroactive to January 1, 1978. The defendant objects on the ground

that Ms. Turner did not prove her unsuccessful application by a preponderance of the evidence.

The finding as to Ms. Turner's application turned on issues of credibility. The Special Master listened to Ms. Turner's testimony, observed her demeanor, and found her to have been "candid at all times." Report at 40. Ms. Turner testified that she moved to Washington, D.C. in the spring of 1977, after serving as the public affairs director for WBRE–TV in Wilkes Barre, Pennsylvania. Report at 19–20; Turner Test., Tr. 9/9/96, at 111–12. She had become familiar with the USIA as a result of having done a thesis paper in pursuit of a graduate degree at American University. Finding 21; Turner Test., Tr. 9/9/96, at 112–13. She became "enamored" with the idea of working at the agency after discussions with agency officials. Finding 24; Turner Test., Tr. 9/9/96, at 113. She actively monitored USIA job announcements in the Summer and Fall of 1977, focusing on positions in the writing, broadcasting, and production fields, Report at 21–22; Turner Test., Tr. 9/9/96, at 116, and she applied for between four and six production specialist jobs in 1977, Turner Test., Tr. 9/9/96, at 117.

That testimony was corroborated by documentary evidence. For example, Ms. Turner produced an SF–171 form for a Writer/Editor position for which she applied in 1977, indicating an interest in production specialist positions. Findings 32–34; Pl. Exh. 2. Her notes from the period corroborated her testimony that she monitored job announcements at USIA. Finding 45; Pl. Exh. 3, 22.

The Special Master found that production specialist positions were advertised in 1977 and that Ms. Turner applied for them. Men were hired for those jobs, and Ms. Turner was not. Report at 26; Turner Test., Tr. 9/9/96, at 118. The Special Master's findings will not be disturbed.

### (6) *Wai-Soo Wong Koo*

The Special Master denied the claim of Wai–Soo Wong Koo, having concluded that she was denied a position for a legitimate non-discriminatory reason. The plaintiff ob-

jects on the ground that the defendant did not sustain his burden of proof.

The Special Master found that Ms. Koo applied for and was qualified to be hired as an international radio broadcaster in 1984. He also found that she was the highest rated candidate. Finding 28. However, the Special Master accepted the hiring official's testimony that he selected another individual for that person's excellent writing skills, which he believed to be the most important factor in selecting a candidate. Finding 30; Warner Test., Tr. 9/24/96, at 141–42. The Special Master found the selecting official's testimony to be credible, Finding 58, and supported by the selectee's SF–171, which emphasized his writing skills and experience, Finding 57; Def. Exh. 3. Contrary to Ms. Koo's assertion that the hiring official applied private criteria that were at odds with the agency's published standards, the Special Master determined that the hiring official's interpretation of the rating factors was not a departure from the announced selection criteria. Findings 65–66. The Special Master's findings are supported by substantial evidence in the record.

## CONCLUSION

For the reasons expressed above, the Court will adopt the reports of the Special Master as to the discovery and liability rulings with respect to Dilara Hashem, Musarrat Burkie, Lynn Goldman Bartlett, Judith Ambrose, Carolyn Turner, and Wai–Soo Wong Koo.