**UNITED STATES of America, Plaintiff,**

v.

**BRODERICK INVESTMENT COMPANY; Tom H. Connolly, as Trustee; and Burlington Northern Railroad Company, Defendants.**

No. 86–Z–369.

United States District Court, D. Colorado.

Aug. 26, 1994.

---

William G. Pharo, Asst. U.S. Atty., Civ. Div., Denver, CO, Jerel L. Ellington, Environment and Natural Resources Div., Environmental Enforcement Section, Denver, CO, Kenneth W. Patterson, Office of Enforcement (LE–134S), U.S. Environmental Protection Agency, Washington, DC, Richard L. Sisk, Office of Regional Counsel, U.S. Environmental Protection Agency, Region VIII, Denver, CO, for plaintiff.

William C. Robb, Gregory A. Ruegsegger, Dufford & Brown, P.C., Denver, CO, for defendant Tom H. Connolly.

Brooke Jackson, John F. Shepherd, Frank P. Prager, Holland & Hart, Denver, CO, for defendant Broderick Inv. Co.

Gary E. Parish, Robert J. Potrykus, Jr., Popham, Haik, Schnobrich & Kaufman, Ltd., Denver, CO, for defendant Burlington Northern R. Co.

## ORDER

WEINSHIENK, District Judge.

This action was brought by the United States under the Comprehensive Environmental Response, Compensation And Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.* The United States is seeking a money judgment to obtain reimbursement of response costs already incurred during the cleanup of groundwater and soil contamination at the Broderick Wood Products Superfund Site (Site), and a declaratory judgment that the defendants are jointly and severally liable for future response costs. Broderick Wood Products Company (BWP), predecessor of defendant Broderick Investment Company (BIC), operated a wood treatment plant on the Site, located in the Platte River Valley near downtown Denver, from 1948 to 1982. BWP's treatment process required use and disposal of hazardous substances, including creosote, at the Site throughout the operating period. *See* Stipulation No. 12.

On October 28, 1993, the Court granted the United States' motion for summary judgment against defendants BIC and Tom Connolly, as Trustee, finding them liable under CERCLA as owners or operators. The Court held a bench trial on the liability of the remaining defendant, Burlington Northern Railroad Company (BN), on April 11, 12, and 13, 1994, and June 21, 22, and 29, 1994.

A. *Determination Of CERCLA Liability And Validity Of Affirmative Defense*

The issues tried April 11–13 were whether defendant Burlington Northern Railroad Company (BN) is liable under CERCLA, 42 U.S.C. § 9607(a)(2), for response costs incurred by the United States at the Site, and whether BN's affirmative defenses were valid.

Four elements for liability under CERCLA are outlined by 42 U.S.C. § 9607: (1) the site at issue is a facility; (2) there has been a release or threat of release of a hazardous substance; (3) the United States incurred costs in response to this release or threat of release; and (4) defendant is a responsible party as defined by 42 U.S.C. § 9607(a).

There is no dispute regarding the first three elements; the only issue is whether BN is a responsible party, and if so whether any defenses apply. The categories of responsible parties are: the owner or operator of the facility, the owner or operator at the time of disposal of the hazardous material, a generator who arranged for disposal at the facility, or a transporter of hazardous waste to the facility.

BN's liability depends on whether it is an owner of a 17.5 acre parcel of land on the western side of the Site (Parcel). The boundaries of the Parcel are described in Exhibit 68. Plaintiff claims that BN's predecessor in interest, the Chicago, Burlington & Quincy Railroad (CBQRR), obtained ownership of the Parcel through a 1908 deed from the Denver, Utah and Pacific Railroad Company (DUPRR). *See* Exhibits 33 and BU. While the Deed does not specifically describe the Parcel, it does contain some general language which the government argued conveyed all properties owned by DUPRR to CBQRR.

BN contends that CBQRR did not know about the alleged ownership interest until 1963, when BWP contacted CBQRR about a possible trespass on the Parcel by several holding ponds built at the Site by BWP. BWP then leased the property from CBQRR, until October 30, 1969, when CBQRR quitclaimed to BWP any interest it might have in the property. *See* Exhibits 4 and E. BWP paid $53,100 for the quitclaim deed.

■ For the reasons stated in the Court's ruling from the bench on April 13, 1994, the Court finds that BN's predecessor, CBQRR, owned the Parcel from 1908 through 1969. Although the 1908 Deed was ambiguous, the United States proved by a preponderance of the evidence that title passed to CBQRR under that Deed. Since CBQRR was an owner of the Parcel at the time the hazardous material was disposed of, BN, as successor to CBQRR, is liable under 42 U.S.C. § 9607(a)(2).

The Court further finds that BN failed to meet its burden of proving the elements of the "innocent landowner defense" set forth at 42 U.S.C. § 9607(b)(3), which states that there shall be no liability for

a person otherwise liable who can establish by a preponderance of the evidence that the release ... of a hazardous substance and the damages resulting therefrom were caused solely by ... an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant.

BN is "otherwise liable," as an owner, the contamination was caused solely by a third party, BWP, and BWP was not an agent or employee of BN or CBQRR. However, CBQRR was in a contractual relationship with BWP. Although a copy of the lease was not entered in evidence, the Court heard James Bollig testify that he believed he saw such a lease. *See* Reporter's Transcript, Trial To Court, filed May 9, 1994, at 105. BN acknowledged that there was "some form of agreement between 1964–9 between CBQRR and Broderick Wood Products and that Broderick Wood Products paid CBQRR annual payments of $600," from December, 1964, to December, 1968. *See* Stipulation No. 21. At trial, defendant's counsel clarified this Stipulation by stating that the "$600 annual payments were made by Broderick Wood Products to CB & Q for the rental or use of the property adjacent to the Broderick Wood Products site." Reporter's Transcript, Trial To Court, filed May 9, 1994, at 101. This is

an admission to the existence of a lease arrangement for the Parcel.

■ Even if the Court accepted the argument that CBQRR did not know it owned the property until 1963, and the Court thinks this assertion is questionable, the rental of land by CBQRR to BWP from 1963 to 1969 was a contractual relationship, and CBQRR knew of the disposal of hazardous wastes on its land during the period of the contract. Therefore, the innocent landowner defense is not available to BN.

## B. *Divisibility*

The issues tried on June 21–22 and 29 were whether BN is jointly and severally liable for all response costs incurred by the United States, and if BN is not jointly and severally liable for all response costs, for which harm is BN liable.

■ Although joint and several liability is commonly imposed in CERCLA cases, it is not mandatory; a limited defense is available based upon the common law doctrine of divisibility of harm. *See O'Neil v. Picillo*, 883 F.2d 176, 178–79 (1st Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *United States v. Chem–Dyne*, 572 F.Supp. 802, 808 (S.D.Ohio 1983). The defense is based on the Restatement (Second) Torts § 433A. *See, e.g., U.S. v. Alcan Aluminum*, 964 F.2d 252, 268–69 (3d Cir. 1992); *U.S. v. Monsanto*, 858 F.2d 160, 171– 73 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Under this section of the Restatement, where two or more joint tortfeasors act independently and cause a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, then each is liable only for damages for its own portion of the harm. But where each tortfeasor causes a single indivisible harm, then damages are not apportioned and each is liable in damages for the entire harm. *In re: Matter of Bell Petroleum Services, Inc.*, 3 F.3d 889 (5th Cir.1993). *See also U.S. v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir.1993).

■ Plaintiff argues that this issue is not appropriate for determination at this time, but should be considered later, during the damages phase of this case or in a contribution action. There are two distinct contexts in which the term "apportionment" has been used in CERCLA cases. Generally, response costs are apportioned, in the common meaning of that word, late in the CERCLA action, under equitable considerations. However, the question of divisibility, meaning the "apportionment" of harm rather than damages, is a different determination which can be made either earlier, at the liability phase, or later, at the damages phase.

The Third Circuit Court of Appeals concluded that the divisibility inquiry is one "best resolved at the initial liability phase" because it involves "relative degrees of liability." *Alcan Aluminum*, 964 F.2d at 270 n. 29. Other courts, including the Fifth Circuit, agree. *See, e.g., Bell*, 3 F.3d at 901. The only Circuit to express a reservation on this point is the Second Circuit Court of Appeals, which declined to make a ruling. Instead, the Second Circuit stated that "the choice as to when to address divisibility and apportionment are questions best left to the sound discretion of the trial court in the handling of an individual case." *Alcan Aluminum*, 990 F.2d at 723. The Court agrees with the Third and Fifth Circuits, and will determine the divisibility of the harm now, early in the litigation.

■ Under the Restatement and *Bell*, the decision of whether to impose joint and several liability turns on whether there is a reasonable basis for dividing liability. This is a question of law. If the harm is capable of being divided among its various causes, the actual apportionment of the harm is a question of fact. *See* Restatement (Second) Torts § 434(1)(b), (2)(b), and cmt d; *Bell*, 3 F.3d at 896. A defendant may present evidence relevant to establishing the divisibility of the harm, such as relative toxicity, migratory potential, extent of actual migration, and synergistic capacities of the hazardous substances at the site. *See Alcan Aluminum*, 990 F.2d at 722; *Alcan Aluminum*, 964 F.2d at 270 n. 29, 271.

BN presented two arguments to support divisibility: first, that the harm was divisible by chronology or time period; and second, that there were separate and distinct geographic areas of contamination. For the reasons stated in the ruling from the bench on June 29, the Court finds that the environmental harm at the Site is not reasonably capable of apportionment on a chronological basis. However, the Court finds that the environmental harm at the Site is divisible geographically. BN presented numerous exhibits, taken from the Environmental Protection Agency's (EPA) own data and figures from the Remedial Investigation (RI) and Feasibility Study (FS), which show two separate areas of groundwater contamination. *See* Exhibits AS through BC. Based on the convincing testimony of Dr. Robert Sterrett, and the reliable and impressive work by Re-Tec, the Court determines that pentachlorophenol drives the groundwater remedy selection by the EPA. Furthermore, the Court is convinced that there are two pentachlorophenol plumes at the Site: one emanating from the pond impoundment area located primarily on the Parcel, and one emanating from the processing plant area to the east of the Parcel. The soil contamination at the Site is similarly divisible geographically. *See* Exhibits BF through BQ.

Since neither BN nor its predecessor ever had an ownership interest in the land on which the processing plant stood, and that plume has neither merged with the pond plume nor migrated onto the Parcel, BN is not responsible or liable for the plume emanating from the processing plant area. The Court notes that in the related case of *Broderick Investment Co. v. The Hartford Accident & Indemnity Co.,* 86–Z–1033 (D.Colo.), the Tenth Circuit also distinguished between the pond plume and the processing plant plume, albeit for the purposes of insurance coverage. *See Broderick Inv. Co. v. Hartford Acc. & Indem. Co.,* 954 F.2d 601 (10th Cir.1992).

### C. *Conclusion*

Therefore, the Court holds that BN is jointly and severally liable for response costs incurred in connection with (1) sludges in the pond impoundments; (2) contaminated groundwater in the pond plume, including the portion of the plume beyond the boundary of the Parcel; (3) contaminated soils within the Parcel; and (4) contaminated soils outside the Parcel but in the area affected by the pond plume and the sludges on the Parcel. BN is not liable for response costs incurred in connection with the processing plant plume or contaminated soils not included in the above categories. The Court declines to adopt any specific percentages at this time and reserves for a later phase of the case application of these findings to the response costs that may be proved by the United States. The amount of response cost incurred by the United States and the extent to which such costs are recoverable under CERCLA will be determined at a later date.