CHEM–NUCLEAR SYSTEMS, INC., et al., Plaintiffs,

v.

**George W. BUSH, et al., Defendants.**

**No. CIV.A. 96–1233 ESH.**

United States District Court, District of Columbia.

March 26, 2001.

As Amended May 2, 2001.

James T. Banks, Hogan & Hartson, L.L.P., Washington, DC, for Plaintiffs.

Scott J. Jordan, U.S. Department of Justice, Environmental Defense Section, Washington, DC, for Defendants.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Before the Court is plaintiffs' motion for entry of final judgment, defendant EPA's motion for final judgment, and the parties' oppositions and replies. Plaintiffs, Chem–Nuclear Systems, Inc. ("CNSI"), and its parent corporation, Chemical Waste Management, Inc. ("CWM"),[1] are seeking reimbursement of a portion of the costs they incurred for the cleanup of hazardous materials at the Basket Creek Drum Disposal Site ("the Site") in Douglasville, Georgia, under § 106(b)(2) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.* Both parties have moved for entry of final judgment. Plaintiffs contend that (1) as Judge Sporkin has previously ruled in this case, the doctrine of administrative exhaustion should not bar this Court from resolving the merits of their geographic divisibility claim which was not raised before the EPA; (2) plaintiffs have proven their theory of geographic divisibility by a preponderance of the evidence; and (3) defendants have not carried their burden, under a previous ruling by Judge Sporkin, of producing evidence linking any of plaintiffs' waste, other than the 80 drums discovered at the Basket Creek Site, to the Site. Defendants argue that (1) plaintiffs' failure to raise their claim of geographic divisibility at the administrative level bars them from bringing it in this Court and Judge Sporkin's ruling in this regard was incorrect; (2) Judge Sporkin erred in placing a burden on defendants to produce evidence linking additional waste from plaintiffs, beyond the 80 drums, to the Basket Creek Site; or in the alternative, (3) defendants have produced sufficient evidence to satisfy their burden. For the reasons explained herein, the Court agrees that defendants have in fact sustained their burden, as imposed by Judge Sporkin. Thus, the Court need not address the remaining arguments raised by the parties, and judgment will be entered in favor of the defendants.

## I. FACTUAL BACKGROUND

The parties submitted to Magistrate Judge Kay a Joint Stipulation of Facts (hereinafter "Ex. 2"), containing 99 factual stipulations and three attachments. These agreed upon facts were adopted by Magistrate Judge Kay, and are the basis for the following description of the relevant facts.

In the 1970's, CNSI received at its Barnwell, S.C. facility, but did not generate, waste material from various industrial generators. Report of the Special Master (Sept. 2, 1999) at 6, ¶ 1 (hereinafter "Report"); Ex. 2, ¶ 1. The waste material received by CNSI contained hazardous substances as defined by CERCLA, 42 U.S.C. § 9601(14). Report at 7, ¶ 2; Ex. 2, ¶ 5. On July 5, 1973, CNSI contracted with Continental Trading Company ("Continental") to remove a number of 55–gallon drums of waste material from CNSI's Barnwell, S.C. facility. Report at 7, ¶ 3; Ex. 2, ¶ 2. In turn, Continental entered into an arrangement with Young Refining Corporation ("Young Refining"), owned and operated by Dr. C.B.F. Young ("Young"), under which Young Refining would store the waste material from

---

1. In this opinion, plaintiffs are referred to collectively as "CNSI" or plaintiffs.

CNSI's Barnwell, S.C. facility at Young Refining's Douglasville, Ga. facility until the wastes were reprocessed and resold, used as fuel, or buried. Report at 7; ¶ 4; Ex. 2, ¶ 4. Between July 1973 and February 1974, approximately 1649 drums of liquid chemical waste were transported by Continental from CNSI's facility in Barnwell, S.C. to Young Refining in Douglasville, Ga. Report at 7, ¶ 5; Ex. 2, ¶ 5.

Mr. Lee Wallace, owner of the Basket Creek Site ("the Site"), a ravine next to Basket Creek Road in Douglas County, Georgia, allowed disposal of waste materials at the Site on numerous occasions from unknown sources over an unknown period of time. Report at 7, ¶ 6; Ex. 2, ¶ 14. The Basket Creek Site is a single ravine that is aligned approximately north-south and slopes downgradient toward the south. Report at 7, ¶ 7; Ex. 2, ¶ 36. Immediately west of the ravine, Basket Creek Road approximately parallels the alignment of the ravine. *Id.* As the ravine deepens to the south, the ravine widens and becomes a broader, deeper valley. *Id.* In 1976, the southern boundary of the ravine terminated at a dam constructed primarily of tires intermixed with soil. Report at 7–8, ¶ 7; Ex. 2, ¶ 36.

On March 5, 1976, Georgia EPA ordered Lee Wallace to cease receipt of waste materials at the Site. Report at 8, ¶ 8; Ex. 2, ¶ 14. Approximately two weeks prior to March 17, 1976, Young arranged with Bartlett Hulsey ("Hulsey") to transfer hazardous substances from Young Refining to an unspecified location or locations for disposal. Report at 8, ¶ 9; Ex. 2, ¶ 25. Young had only one conversation with Hulsey about the removal and disposal of the drums of waste. Report at 8, ¶ 10; Ex. 2, ¶ 25; Ex. 81 (Young Dep. at 36, 60).[2] Young admitted Hulsey had picked up two trailer loads of drums from Young Refining. Report at 8, ¶ 11; Ex. 2, ¶ 25. In March 1976, aside from drums of boiler compound that Young Refining used in its business, Young Refining did not have any drums other than the ones that originated from CNSI. Report at 8, ¶ 12; Ex. 81 at 65–67.[3]

On March 17, 1976, two tractor trailer rigs owned by Hulsey transported approximately 160 drums (approximately 80 per trailer) the twenty miles from Young Refining to the Basket Creek Site. Report at 8, ¶ 13; Ex. 2, ¶ 15; Ex. 72. At approximately 9:45 p.m. on March 17, 1976, Douglas W. Daniell ("Daniell"), the Douglas County Supervisor of Environmental Health, arrived at the Basket Creek Site in response to a complaint from a nearby resident. Report at 8, ¶ 14; Ex. 2, ¶ 16. At the Site, Mr. Daniell saw two tractor-trailer rigs, one of which was empty, and four men, including Bartlett Hulsey. Report at 8, ¶ 15; Ex. 2, ¶ 17. Mr. Daniell observed approximately 80 drums in the ravine beside the road, some of which had burst open in the ravine. Report at 8–9, ¶ 16; Ex. 2, ¶ 17. A bulldozer was covering and crushing drums in the ravine, and liquid was spilling out of the drums into the ravine. Report at 9, ¶ 17; Ex. 2, ¶ 17.[4]

---

**2.** While the stipulated fact ¶ 25 stated: "Young stated that on one occasion only Hulsey arranged to transfer hazardous substances from the Young Refining facility," (Ex. 2, ¶ 25), it is clear from the Young deposition that what Young stated was that he did not remember Hulsey hauling materials for him before this arrangement, and that after the agreement was reached, they did not have further conversation about the disposal pro-ject prior to the March 17, 1976 incident. *See* Ex. 81 (Young Dep. at 36, 60).

**3.** By the time this case was filed, Hulsey had died and Young's records regarding the disposal of CNSI's 1649 drums after they reached Young's refinery had been destroyed. Ex. 81 (Young Dep. at 55–60).

**4.** Young testified that he believed the bulldozer was owned by Hulsey. Ex. 81 (Young Dep. at 38).

On March 18, 1976, officials from the Georgia Environmental Protection Division inspected the Site and confirmed that approximately 80 partially covered drums were at the bottom of the ravine. Report at 9, ¶ 18; Ex. 2, ¶ 20.

In 1990, EPA began investigations of the Site to determine whether any response was needed. Report at 9, ¶ 19; Ex. 2, ¶ 38. Various soil and waste samples were taken and analyzed. *Id.* On April 11, 1991, EPA determined that the conditions at the Site may have presented an imminent and substantial endangerment to the public health or welfare, or the environment due to the release or threat of release of hazardous substances, and issued an Administrative Order pursuant to CERCLA § 106(a), 42 U.S.C. § 9606(a). Report at 9, ¶ 20; Ex. 2, ¶ 39. The Administrative Order named Young Refining Corporation, Continental Trading Company, Chem–Nuclear Systems, Inc., and B.B. Hulsey d/b/a/ Hulsey Grading Company as Respondents. Report at 9, ¶ 21; Ex. 22 at 1. In the Administrative Order, EPA directed the Respondents to, *inter alia*, excavate overlying soils and remove buried drums, sample and analyze drum contents, arrange for the proper disposal of drum contents, sample soils in the drum burial area, properly treat and/or dispose of any contaminated soil, and restore the Site to its original condition. Report at 9, ¶ 22; Ex. 2, ¶ 41. Hulsey denied liability on April 17, 1991, and stated that he was unable to perform any of the required actions. Report at 9, ¶ 23; Ex. 2, ¶ 42. Continental denied liability on April 22, 1991, and offered on May 10, 1991, to contribute to the actions required by the Administrative Order, but ultimately failed to do so. Report at 10, ¶ 24; Ex. 2, ¶ 43. Young Refining denied liability on April 25, 1991, and refused to participate in performing any of the actions required by the Administrative Order. Report at 10, ¶ 25; Ex. 2, ¶ 44. On April 26, 1991, CNSI denied liability for the Site but notified EPA of its intent to cooperate with EPA Region IV in the performance of reasonable removal actions at the Site. Report at 10, ¶ 26; Ex. 2, ¶ 25. CNSI also noted certain reservations. *Id.*

CNSI and Young Refining Co. solicited bids from ENSITE/Law Environmental, Inc., Kiber Associates, and the Environmental Remedial Action Division of Chemical Waste Management ("ENRAC") to perform the clean-up tasks associated with the Administrative Order. Report at 10, ¶ 27; Ex. 2, ¶ 38. ENRAC submitted the lowest bid for a removal action consistent with the Administrative Order, and CNSI selected it to serve as the Removal Action Coordinator/Constructor for the Site. Report at 10, ¶ 28; Ex. 2, ¶¶ 40, 46. CNSI submitted its Removal Action Plan ("RAP") to EPA on May 16, 1991, and EPA approved the RAP on May 21, 1991. Report at 10, ¶ 29; Ex. 2, ¶¶ 47, 48. On July 12, 1991 CNSI revised the RAP to include information submitted to EPA at a June 27, 1991 meeting, and EPA approved the revised RAP on July 16, 1991. Report at 10, ¶ 30; Ex. 2, ¶¶ 49, 51.

During the cleanup, CNSI removed the wastes, contaminated soil, tires, drums and debris from the ravine in three phases, beginning with the north end of the ravine ("Area 1"), continuing with the south portion of the ravine ("Area 3"), and concluding with the middle portion of the ravine ("Area 2"). Report at 10–11, ¶ 31; Ex. 2, ¶ 53; Ex. 30. Area 2 was subdivided into three stockpiles. Report at 11, ¶ 32; Ex 2, ¶ 66. Soil samples from all three areas contained materials that are listed as hazardous substances under CERCLA. Report at 11, ¶ 33; Ex. 2, ¶¶ 30, 31, 32, 55, 57, 58. Drummed waste in Area 1 also contained materials that are listed CERCLA hazardous substances. Report at 11, ¶ 34; Ex. 2, ¶¶ 30, 31, 32, 56. During the remed-

iation process, 1,881.44 tons of contaminated materials were removed from Area 1; 9,427.69 tons of contaminated materials were removed from Area 2; and 9,934.18 tons of contaminated materials were removed from Area 3. Report at 11, ¶ 35; Ex 2. ¶¶ 64, 69, 73; Ex. 52. Stockpile 1 in Area 2 consisted of 2,884.45 tons of contaminated material. Report at 11, ¶ 36; Ex 2, ¶ 76; Ex. 52. Based on the opinion of CNSI's expert regarding the limited area of the Site that could have been contaminated by the 80 drums which Hulsey had dumped on March 17, 1976, CNSI has agreed to assume responsibility for all cleanup costs associated with contamination of the Site by those 80 drums. Report at 11, ¶ 37; Pl. Open. Br. (10/6/97) at 5 n. 3.[5] However, plaintiffs argue that they are entitled to $2,557,989 in reimbursement, plus pre-judgment interest, for those clean-up costs that could not be associated with the 80 drums.

## II. PROCEDURAL BACKGROUND

This case has had a long and tortured history and is unduly complicated by the passage of time and unavailability of evidence. While the relevant events occurred in the mid-seventies, the legal wrangling began in 1991 at the administrative level and continued in 1996 in the courts. Thus, the pertinent procedural history defies simple recitation.

Pursuant to the order issued by EPA on April 11, 1991, under § 106(a) of CERCLA, plaintiffs remediated the Site, incurring costs of $7,660,315. Although plaintiffs subsequently sued other entities for contribution under CERCLA, they still had to cover most of the remediation costs.[6] Plaintiffs then filed a timely petition with the EPA for reimbursement from the Superfund of the expended response costs for which it disavowed responsibility, pursuant to CERCLA § 106(b)(2)(A).[7] On April 29, 1996, EPA's Environmental Appeals Board ("EAB") rejected plaintiffs' administrative petition for reimbursement, finding that plaintiffs were jointly and severally liable for the entire harm caused at the Basket Creek Site. Within thirty days of receipt of the EAB's decision, plaintiffs filed a timely action in this Court in accordance with CERCLA § 106(b)(2)(B), seeking reimbursement from the Superfund.[8]

This case was initially assigned to the Honorable Stanley Sporkin.[9] Judge Spor-

5. EPA produced no expert to contradict the conclusions of J. Laurence Hosmer, CNSI's expert. Report at 11, ¶ 38.

6. In 1986, Congress amended CERCLA to provide for a statutory cause of action for contribution. See 42 U.S.C. § 9613(f)(1) (1994). CNSI's contribution litigation yielded settlements with three different parties in the following amounts: Lockheed Corp.— $275,000; United States Air Force/United States—$200,000; and Young Refining— $34,000. Ex. 2, ¶ 99.

7. Under CERCLA § 106(b)(2)(A), a party that has complied with an order to address "an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility," may "petition the President for reimbursement from the Fund for the reasonable costs of such action, plus interest." 42 U.S.C. § 9606(b)(2)(A).

8. Plaintiffs bring this suit under CERCLA § 106(b)(2)(B), which provides that "[i]f the President refuses to grant all or part of a petition made under this paragraph, the petitioner may within 30 days of receipt of such refusal file an action against the President in the appropriate United States district court seeking reimbursement from the Fund." 42 U.S.C. § 9606(b)(2)(B). Plaintiffs bear the burden of proof, and "to obtain reimbursement, [must] *establish by a preponderance of the evidence that it is not liable for response costs* under section 9607(a) of this title and *that costs for which it seeks reimbursement are reasonable in light of the action required by the relevant order.*" 42 U.S.C. § 9606(b)(2)(C) (emphasis added).

9. Following Judge Sporkin's retirement in 2000, this case was reassigned to the undersigned.

kin referred the matter to Magistrate Judge Alan Kay on January 9, 1998, appointing him as a Special Master pursuant to Fed.R.Civ.P. 53 and 28 U.S.C. § 636(b)(2). Magistrate Judge Kay issued his Report on September 2, 1999, concluding that plaintiffs had failed to exhaust their administrative remedies by not advancing their theory of geographic divisibility before the EPA, and thus, they were barred from making that claim in court.

In an effort to assist the trial court, Magistrate Judge Kay nonetheless proceeded to address the merits of plaintiffs' geographic divisibility claim. Plaintiffs claimed that the harm caused by them at the Site, consisting of hazardous materials released from the 80 drums of waste disposed of on March 17, 1976, was geographically divisible from the rest of the harm at the Site. This theory of geographic divisibility was explicated by Magistrate Judge Kay as follows:

> In constructing the precise location 20 years after the disposal of the waste material, CNSI utilized calculations based upon what it believes to be the point at the top of the ravine from which the drums of waste were dumped. This location was determined relative to a concrete marker which denotes the southern boundary of the Wallace property. Daniell estimated that he parked his car no further than 55 feet beyond the boundary marker. He parked behind the loaded tractor-trailer, which in turn, was parked behind the empty tractor-trailer. All vehicles were parked roughly parallel to the ravine. Using the length of the tractor-trailers and the estimated space between the vehicles, CNSI calculated that no drums were dumped beyond a point 165 feet north of the boundary marker. Accounting for the fact that the ravine sloped southward at an 8.5% grade, CNSI's expert concluded that the drums came to rest approximately 158 feet north of the

boundary marker. Further, taking into account that the waste may have percolated slightly uphill, the expert maintained that 170.8 feet is the maximum distance northward CNSI's waste may have traveled after it was dumped into the ravine. CNSI agrees to bear the burden of the cost for remediation of the Site south of the 170.8–foot line, but seeks reimbursement for the remediation costs of the area north of this line."

Report at 12. Based on this theory, plaintiffs sought reimbursement for cleanup costs associated with Area 1 of the Site, which was a considerable distance north of the 170.8–foot line, and Stockpiles 2 and 3 of Area 2, which were entirely north of the 177–foot line. Plaintiffs have assumed the costs of Stockpile 1 of Area 2, which was in large part south of the 170.8 foot line, and Area 3, which was entirely south of that line. As Magistrate Judge Kay summarized, "[b]ased upon these calculations, CNSI assumes responsibility for the cost of remediation of that portion of the ravine contaminated by the 80 drums of chemical waste, but denies responsibility for the cost of remediating the remainder, maintaining that the contents of the drums could not have migrated into the northern 'uphill' portion of the ravine." Report at 13.

Magistrate Judge Kay noted that in determining the scope of CERCLA liability, courts have accepted geographic divisibility arguments as a way for responsible parties to avoid joint and several liability. Report at 31 (citing *One Wheeler Road Assoc. v. Foxboro Co.*, No. Civ. A. 90–12873–RGS, 1995 WL 791937, at *10 (D.Mass. Dec.13, 1995); *Kamb v. United States Coast Guard*, 869 F.Supp. 793, 799 (N.D.Cal.1994); *United States v. Broderick Investment Co.*, 862 F.Supp. 272, 277 (D.Colo.1994)). While EPA argued that precedent did not support the application of geographic divisibility to a single contig-

uous site, but only to a site with "geographically distinct areas of contamination ..." (Report at 32), Magistrate Judge Kay rejected this construction as too narrow in light of case law construing CERCLA liability. Instead, he recognized "the possibility that the harm at a site may be divisible based on factors other than geographically distinct areas of contamination," and concluded, based on the opinion of plaintiffs expert, J. Lawrence Hosmer (*see* Ex. 50), regarding the location of the 80 drums and the migration of the waste within the Site, which was unrebutted by the EPA, that the plaintiffs had proved by a preponderance of the evidence that the waste at Basket Creek Site was capable of division based on the location of the 80 drums of waste that had been dumped on March 17, 1976. Report at 32, 35.

However, while Magistrate Judge Kay found that plaintiffs had demonstrated that the harm from the 80 drums was geographically divisible from the remaining harm at the Site, he concluded that because plaintiffs could not prove by a preponderance of the evidence that the only CNSI waste at the Site was the 80 drums, plaintiffs could not succeed.[10] Magistrate Judge Kay therefore recommended entry of judgment in favor of defendants.

Upon consideration of the Magistrate Judge's Report, Judge Sporkin issued a Memorandum Opinion on December 23, 1999. First, Judge Sporkin ruled that the divisibility claim should be addressed on the merits "in the interest of expedition and fairness to both parties," thereby rejecting the recommendation that the case be dismissed for failure to exhaust administrative remedies. Mem. Op. at 3. With respect to the merits of the claim, Judge Sporkin ruled that "[t]o the extent that Plaintiffs have proved the 'harm' it caused is geographically divisible from the remaining contamination of the Site, EPA must submit proof that Plaintiffs contributed to other harm at the Site before the burden shifts to Plaintiffs to prove that it is not liable for those other harms." *Id.* at 4.[11] Struck by the apparent inequity of holding plaintiffs jointly and severally liable for all of the harm at the Site absent evidence linking additional waste from plaintiffs to the Site, Judge Sporkin remanded to Magistrate Judge Kay to "determine the issues on a substantive basis." *Id.* at 5. In particular, the Special Master was directed that if he determined that "the Government has not rebutted the factual predicate underlying Plaintiffs' geographic divisibility argument, or that the Government has failed to carry its burden to link Plaintiffs to the harms caused outside of the geographically divisible area, ... [he] should proceed to make findings and recommendations on Plaintiffs' liability and possible reimbursement arising out of its cleanup of hazardous materials at the Basket Creek Site." *Id.*

On remand, Magistrate Judge Kay concluded in his Second Report that "the gov-

---

**10.** In the first Report, Magistrate Judge Kay found that "[n]otwithstanding the undersigned's conclusion that the harm at the Site is capable of division based on the location of the 80 drums of waste in the Site, CNSI must prove by a preponderance of the evidence that other waste delivered by CNSI, through Continental, to Young, did not find its way into the Site. Crucial to CNSI successfully proving that it is entitled to reimbursement for costs expended in cleaning up the Site under its geographic divisibility theory is the precise location of all CNSI waste in the

Site." Report at 36. Magistrate Judge Kay opined that "neither party present[ed] evidence sufficient to account for the movement of the drums after they were delivered to Young Refining. The limited evidence and argument of the parties is not persuasive that either conclusion is more credible." *Id.* at 39.

**11.** Judge Sporkin ruled that defendants must present "some evidence" or "actual evidence" linking plaintiffs to the rest of the harm at the Site. Mem. Op. at 4.

ernment has neither rebutted the factual predicate underlying Plaintiffs' geographic divisibility theory nor linked CNSI to the harm beyond the 80 drum area of the Site so as to shift the burden of going forward or burden of proof back to CNSI." Second Report of the Special Master (Sept. 18, 2000) at 2 ("Second Report"). He first found "that the waste from those 80 drums did not migrate beyond the boundaries constructed by CNSI's expert and thus could meet a geographic divisibility theory of liability. The evidence of the area of contamination attributable to the 80 drums submitted by CNSI was not persuasively rebutted by the government." *Id.* at 11. He then considered whether the government had presented sufficient evidence of other CNSI waste at the Site. He concluded, as he had in his first Report, "that neither CNSI nor the government has presented any evidence to support a finding that the balance of the CNSI drums delivered to Young Refining in 1973 and 1974 were disposed of at the Basket Creek Site." *Id.* at 13. The Magistrate Judge also found that "the series of events relied upon by the government to link CNSI drums to other contamination merely demonstrates a possibility that some of the waste discarded in the Northern part of the Site came from CNSI drums." *Id.* at 15. The Second Report then considered plaintiffs' evidence as to the sufficiency of the data establishing the amount of plaintiffs' costs and the reasonableness of such costs. The conclusions of the Special Master in the Second Report are now before this Court.

## III. STATUTORY FRAMEWORK

"Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) ... in 1980 to 'provide for liability, compensation, cleanup, and emergency response for haz-

ardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites.'" *Kelley v. EPA,* 15 F.3d 1100, 1103 (D.C.Cir.1994) (citation omitted). The statutory scheme allows the President to order parties to clean up hazardous waste sites if, *inter alia,* "there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility ...." 42 U.S.C. § 9606(a). The President has delegated authority under this section of CERCLA to the Administrator of EPA. *See* Exec. Order No. 12,580, § 4(d)(1), *reprinted in* 42 U.S.C. following § 9615.

"In CERCLA, Congress established 'an array of mechanisms to combat the increasingly serious problem of hazardous substance releases,'" *United States v. Monsanto,* 858 F.2d 160, 167 (4th Cir.1988) (citing *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1078 (1st Cir.1986)). "[T]he statute provides the federal government with the tools necessary for a prompt and effective response to problems of national magnitude resulting from hazardous waste disposal, and it evinces congressional intent that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." *Id.* at 167 n. 8 (citation and internal quotation marks omitted). One of these tools is the provision for strict liability of responsible parties, including the owners of sites where hazardous wastes are discharged, as well as the transporters and generators of hazardous wastes. *See id.* at 167 ("We agree with the overwhelming body of precedent that has interpreted section 107(a) as establishing a strict liability scheme."); 42 U.S.C. § 9607.[12]

---

**12.** Plaintiffs fall within the category of "any     person who by contract, agreement, or other-

It has been recognized by both courts and commentators that the CERCLA statutory scheme can be harsh, for as one district court has explained:

In enacting CERCLA, Congress made the public policy decision to place the burden of the cost of remedying environmental damage upon "responsible parties," an aptly-named class defined by Congress in sweeping terms, without regard to individual intent, expectation, guilty knowledge or degree of negligence. Strict liability is imposed upon those whose business operations generate hazardous waste, even in cases where such "responsible parties" entrusted such materials to a contractor promising their safe handling, storage, recycling or ultimate disposal. Congress has determined, as a matter of public policy, that generators transfer their toxic byproducts to others at their own peril.

*Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F.Supp. 1278, 1332 (D.Utah 1994), *aff'd*, 52 F.3d 1522 (10th Cir.1995).[13] Moreover, while "[i]t has not gone unnoticed that holding defendants jointly and severally liable in such situations may often result in defendants paying for more than their share of the harm ..., courts have continued to impose joint and several liability on a regular basis, reasoning that where all of the contributing causes cannot fairly be traced, Congress intended for those proven at least partially culpable to bear the cost of the uncertainty." *O'Neil v. Picillo*, 883 F.2d 176, 179 (1st Cir.1989).

While joint and several liability under CERCLA § 107(a), 42 U.S.C. § 9607(a), "is not mandatory in all ... cases," *Bell Petroleum Serv. v. Sequa Corp.*, 3 F.3d 889, 895 (5th Cir.1993), "[t]he practical effect of placing the burden on [responsible parties] has been that responsible parties rarely escape joint and several liability, courts regularly finding that where wastes of varying (and unknown) degrees of toxicity and migratory potential commingle, it simply is impossible to determine the amount of environmental harm caused by each party." *O'Neil*, 883 F.2d at 178–79 (citing *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 811 (S.D.Ohio 1983); *Monsanto*, 858 F.2d at 172–73). Liability under CERCLA may be apportioned among liable parties if there is a "reasonable basis" for it, but "the question whether there is a reasonable basis for apportionment depends on whether there is sufficient evidence from which the court can determine the amount of harm caused by each defendant." *Bell*, 3 F.3d at 903.

wise arranged for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3).

13. The Second Circuit has also recognized the potential unfairness of this statutory framework:

In passing CERCLA Congress faced the unenviable choice of enacting a legislative scheme that would be somewhat unfair to generators of hazardous substances or one that would unfairly burden the taxpaying public. The financial burdens of toxic clean-up had been vastly underestimated— in 1980 when CERCLA was enacted $1.8 billion was thought to be enough. In 1986 when the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. No. 99–499, 100 Stat. 1613 (1986), was passed, $100 billion was held to be needed. It may well be more today. It is of course the public-at-large that is already bearing the economic brunt of this enormous national problem. There may be unfairness in the legislative plan, but we think Congress imposed responsibility on generators of hazardous substances advisedly. And, even were it not advisedly, we still must take this statute as it is.

*United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 716–17 (2d Cir.1993).

"[E]ven where commingled wastes of unknown toxicity, migratory potential, and synergistic effect are present, defendants are allowed an opportunity to attempt to prove that there is a reasonable basis for apportionment (although they rarely succeed) . . . ." *Id.* at 901.

## IV. ANALYSIS

With these guiding principles in mind, the Court will proceed to consider the novel issues which have arisen here as a result of applying the theory of geographic divisibility to a single contiguous site. One such issue is whether the Special Master correctly concluded that defendants failed to produce sufficient evidence to shift the burden to plaintiffs to prove that no more than 80 drums of CNSI waste contributed to the contamination of the Site. Second Report at 14–15.[14] "The question whether the harm to the plaintiff is capable of apportionment . . . is a question of law." *Bell,* 3 F.3d at 896 (citing Restatement (Second) of Torts § 434(1)(b) and rejecting clearly erroneous standard of review of district court finding of apportionment).[15] Therefore, the Court reviews de novo the Special Master's conclusion that the gov-

ernment failed to carry its burden of producing evidence linking plaintiffs to the harm at the Site which was unrelated to the 80 drums.[16] As explained below, the Court cannot accept the Magistrate's recommendation, for it finds that the evidence raises a reasonable inference that plaintiffs caused harm at the Site beyond the 80 drums, thereby shifting the burden back to plaintiffs to disprove this inference. And, because plaintiffs cannot prove by a preponderance of the evidence that they are not liable for any additional waste, defendants are entitled to entry of judgment in their favor.[17]

In the Second Report, Magistrate Judge Kay did not "alter[ ] his conclusion that neither [plaintiffs] nor the government has presented any evidence to support a finding that the balance of the [plaintiffs'] drums delivered to Young Refining in 1973 and 1974 were disposed of at the Basket Creek Site." Second Report at 13. He concluded, however, that "in light of the district court's December 23, 1999 Memorandum Opinion, it is the government's responsibility to initially demonstrate by 'some' or 'actual' evidence that CNSI

14. Magistrate Judge Kay stated in the Report that the government's evidence did not "in the opinion of the special master, meet the district court's directive requiring the government to show *actual* or *some* evidence of the linkage. The undersigned finds that the series of events relied upon by the government to link CNSI drums to other contamination merely demonstrates a possibility that some of the waste discarded in the Northern part of the Site came from CNSI drums." Second Report at 15.

15. "Once it has been determined that the harm is capable of being apportioned among the various causes of it, the actual apportionment of damages is a question of fact." *Id.* (citing Restatement (Second) of Torts § 434(2)(b) & cmt d).

16. "A Special Master's findings of fact in a non-jury action are to be accepted unless they are clearly erroneous[,] Fed.R.Civ.P. 53(e)(2),

. . . [and] conclusions of law are reviewed de novo." *Hartman v. Duffey,* 973 F.Supp. 189, 192 (D.D.C.1997) (citing *Oil Chemical & Atomic Workers Int'l Union, AFL–CIO v. NLRB,* 547 F.2d 575, 580 (D.C.Cir.1976)).

17. Because the Court finds that defendants have produced sufficient evidence to satisfy the burden articulated by Judge Sporkin in his December 23, 1999 Memorandum Opinion, it need not revisit the correctness of Judge Sporkin's rulings that plaintiffs are not required to exhaust administrative remedies as to their claim of geographic divisibility, or that the government has the burden to produce evidence linking plaintiffs to waste beyond the 80 drums at the Site in order to defeat plaintiffs' claim of geographic divisibility.

drums other than the 80 drums seen by Douglas Daniell on March 17, 1976 contaminated the Site," and that the government had failed to satisfy this burden. *Id.*[18]

While this Court respects the Magistrate Judge's careful and thorough analysis and his efforts to apply the law as set down in the Memorandum Opinion of December 23, 1999, it cannot agree that defendants have not presented sufficient evidence upon which a reasonable person could infer that additional CNSI waste from Young's refinery was discharged at the Site.[19] The parties have stipulated that plaintiffs sent approximately 1649 drums of waste to Young Refining in 1973–1974. Ex. 2, ¶ 5. Initially, Young planned to dispose of the waste by burning it. Ex. 81 (Young Dep. at 63). Some of the waste delivered to Young from CNSI could not be incinerated because it lacked appropriate BTU value or contained water. Ex. 2, ¶ 10. The same material could not be reprocessed. *Id.* While some amount of the waste was burned, Ex. 2, ¶ 7, the burning created an odor, and after Georgia's Environmental Protection Division ("EPD") objected to the burning, it was halted. Ex. 81 (Young Dep. at 63). Defendants have produced evidence that a large number of the 1649 drums remained at Young Refining in March 1976, when Young was approached by Hulsey. Dr. Young testified in his deposition that Hulsey came to him and stated that he could dispose of the CNSI drums:

Q: And how many drums was he going to dispose of for you?

A: I don't remember a specific number. He said 'I can dispose of those drums for you.' We had them off to themselves sitting on the ground in the back of the plant where they were not in—I didn't need the land at that time.

Q: How many drums were there?

A: Where? At our plant?

Q: Yes, there at the plant that you had gotten from Chem–Nuclear and Continental that Mr. Hulsey was going to move for you?

A: I would say that I've accounted for as many as, oh, 1200, 1400 drums, and maybe as high as 1800 drums.

Q: And was it your understanding that Mr. Hulsey was going to dispose of all of those drums?

A: To the best of my knowledge, that was the agreement. He said, I can take care of these drums for you. And we made a deal.

Ex. 81 (Young Dep. at 54–55).[20] Young

---

**18.** Contrary to plaintiffs' assertions, Judge Sporkin did not find that the defendants had failed to produce evidence to satisfy this burden. Such a claim is belied by the fact that the judge referred this issue to Magistrate Judge Kay for his determination. The Court interprets Judge Sporkin's statements in the Memorandum Opinion with respect to defendants' evidence as reiterating Magistrate Judge Kay's conclusions in the first Report that neither plaintiffs nor defendants had presented evidence sufficient to account for the movement of the drums after they were delivered to Young Refining.

**19.** The Court agrees that, if there is some burden of production on the government, which this Court need not decide, that burden must be less than a preponderance standard, since it is agreed that plaintiffs have the burden of proof by a preponderance of the evidence under 42 U.S.C. § 9606(b)(2)(C). For the purposes of this opinion, the Court adopts plaintiffs' formulation: the EPA must present " 'some evidence' showing that other wastes belonging to CNSI were dumped anywhere in the Site." If such evidence is provided, then CNSI has the burden of proving, by a preponderance of the evidence, that it did not dump waste other than the 80 drums. CNSI's Memorandum in Response to EPA's November 2000 Motion at 26.

**20.** While plaintiffs argue that Young was referring to the total number of CNSI drums shipped to Young's refinery that he had been

estimated that this conversation occurred a week or two before the Basket Creek incident. *Id.* at 55. The drums had been at Young's plant for about two years prior to this. *Id.* at 63. Young does not know how many drums Hulsey picked up from the plant, nor was he there when Hulsey picked up drums for disposal. *Id.* at 64, 60. At the time, there were only a few drums in the plant that did not come from CNSI. *Id.* at 65–67; Report at 8, ¶ 12.

In his deposition, Young also testified that 250 or 275 drums were moved to Alabama temporarily and were brought back to Young Refining and put in a tank that was ultimately sealed by Georgia EPD. *Id.* at 69, 71. Young did not specify when the material was sent to Alabama. Young guesses that the material was brought back to Young Refining and put in a tank several months after the Basket Creek incident. *Id.* at 69–70. The Georgia EPD report of a February 24, 1976 trip to Young Refinery indicates that Young "had 250 drums of waste oils, alcohols, and greases which they shipped to their plant in Borden Springs, Alabama for storage." Ex. 84 at 1. The report also

states that "they have been bringing [the drums] back slowly, and putting the contents back into their own refinery system for recycling or incineration ...." *Id.*[21] The Georgia EPD report of an April 8, 1976 trip to Young Refinery indicates that as of that date, "Young reported that all of the liquid waste being held at his Borden Springs, Alabama facility had been removed from the 55–gallon drums, loaded into tankers, and transported to the Douglasville, Georgia plant.... [Young] had also removed the waste material from the eighty 55–gallon drums being held on his property, and placed the entire quantity from tankers and drums in two large storage tanks # 223 and # 224 on his property." Ex. 82. The report states the tanks contained 12,421 gallons and 11,531 gallons respectively, for a total of 23,952 gallons. *Id.* This is the equivalent of about 435 55–gallon drums.

Therefore, the evidence indicates that while in early March 1976, Young had at least 1200 drums of CNSI waste, by April 8, 1976 Young had the equivalent of about 435 drums, including the 250 or 275 drums that had been in Alabama and the 80

able to account for in the years preceding his deposition, and not the number present there at the time of his conversation with Hulsey, both the question and the follow-up question make clear that the questioner was referring to the CNSI drums that were present in March 1976 which Hulsey had agreed to dispose of. The Court is unwilling to speculate that Young misunderstood the import of the question and intended to answer a different question.

21. Plaintiffs argue that Young was referring to 250 or 275 drums sent to Alabama after the March 1976 Basket Creek incident, including the 80 drums returned from the Site, separate from an earlier shipment of 1000 drums. While Young's testimony is not entirely clear, such an interpretation is not supported by the evidence, and is contradicted by the February 1976 report which indicates that the 250 drums were in Alabama at that time, but were being returned slowly to the Douglasville

plant. Ex. 84. The more plausible interpretation of the testimony is that Young was simply confused as to when 250 or 275 drums were shipped to Alabama, and when they were returned. The two EPD reports state that, according to Young, the drums were sent before February 1976, and were returned by April 8, 1976 and placed in the storage tanks. Ex. 82, 84. The two storage tanks at Young Refining were sealed by EPD on April 28, 1976. Ex. 88. Young testified that the waste from Alabama was sealed in these tanks (Ex. 81 (Young Dep. at 69)), and therefore it could not have been returned "several months" later (*id.* at 70). Moreover, there is simply no evidence that the 80 drums returned from the Site (or any other drums) were sent to Alabama after March 17, 1976 and returned to Douglasville by April 8, 1976. Finally, Young does not testify as to an earlier shipment of 1000 drums. The Court therefore cannot accept plaintiffs' interpretation of this testimony.

drums that had been returned from the Site.[22] While an additional 80 drums were disposed of at the Site, at least 685 drums remained unaccounted for.[23] While some quantity of this waste was incinerated, there is no evidence to support a conclusion that over 600 drums were incinerated between early March, when Young testified he had 1200 or more drums, and early April, when 435 drums of waste were in Young's storage tanks.

Rather, the circumstantial evidence supports an inference that Hulsey disposed of at least some, if not all, of these unaccounted for drums at the Site. Hulsey and Young had an agreement in early March that provided that Hulsey would dispose of the 1200 or more drums that remained at Young Refining. Hulsey had the ability to dispose of the drums using the two trailers that he was using on March 17, 1976, which could transport approximately 80 drums each. Because the distance between the Site and Young's refinery was only about 20 miles (Ex. 72), the necessary number of trips could easily have been made within this time period.[24] Hulsey had a bulldozer and a front-end loader in the ravine at the Site, which suggests that he was involved in ongoing disposal there,

not a one-time dumping operation. *See* Ex. 81 (Young Dep. at 37–38). Moreover, while it can be expected that plaintiffs' waste contained common hazardous substances, the samples taken from the northern part of the Site, where plaintiffs claim that the 80 drums were not discharged, were repeatedly found to contain the same hazardous substances that were in the CNSI wastes. Ex. 2, ¶¶ 3, 35, 95–96 and Attachments A, B, and C.[25] Most significantly, on March 17, 1976, Hulsey was discovered with a trailer loaded with 80 drums from Young's refinery and an empty trailer. Approximately 80 drums were in the ravine beside the road, and a bulldozer was covering and crushing drums in the ravine. Finally, by April 8, 1976, the equivalent of only some 435 drums remained at Young's refinery.

Given this record, the evidence is sufficient to support an inference that Hulsey did what he told Young that he would do—dispose of the additional CNSI waste, and that he accomplished this at the Site that was near Young's refinery. Thus, the burden is shifted to plaintiffs to prove by a preponderance of the evidence that no additional CNSI waste was disposed of at the Site.[26]

---

**22.** Young also testified that there were other drums still at the refinery when the 80 drums were returned from the Site. Ex. 81 (Young Dep. at 70). These additional drums may account for the difference between the 435 drums worth of waste in the tanks and 250 (or 275) drums from Alabama plus 80 drums from the Site. In addition, EPD reported that Young was adding his own oil to the two storage tanks and slowly incinerating the diluted waste. Ex. 82 at 1. This dilution might also account for the greater quantity of waste in the tanks.

**23.** Defendants argue that 605 drums are unaccounted for, but their calculation counts the 80 drums returned from the Site twice-once as part of the 435 drums placed in the storage tanks and again as part of the 160 drums involved in the March 17 incident.

**24.** Four trips of 160 drums each would have been sufficient to dispose of 640 drums.

**25.** While this alone is insufficient to link additional CNSI wastes to the Site, it demonstrates that the contamination was not inconsistent with additional waste from CNSI.

**26.** Plaintiffs argue, citing *United States v. Wade*, 21 E.R.C. 1346 (E.D.Pa.1984) and *United States v. Bliss*, 667 F.Supp. 1298, 1310 (E.D.Mo.1987), that defendants' allegations regarding the remainder of their waste are insufficient to establish liability as to any additional waste. *See* CNSI's Memorandum in Response to EPA's November 2000 Motion at 32–33. The court in *Wade* held that in order to establish the liability of a party with respect to a site, the government must show that waste from a particular party was in fact

In response, plaintiffs argue that an additional 1000 drums of CNSI waste were sent to Alabama before March 1976 and remained there until after March 1976, accounting for the drums left unaccounted for by the government's theory. There are two principle pieces of evidence supporting this theory. First, Continental's and Young's records indicate that on or about September 26, 1974, Continental advanced Young $10,000 to move drums at a rate of $12 per drum to Young's Borden Springs, Alabama facility. Ex. 2, ¶ 11; Ex. 10.[27] Second, on March 21, 1976, Jack Hunnicutt of the Alabama Department of Public Health reported to Georgia environmental officials that there may be approximately 1000 drums at the Borden Springs facility. Ex. 2, ¶ 12.[28] In addition, the Georgia EPD report of an April 30, 1976 trip to Young Refinery states that "Young still has some waste in Alabama." Ex.

110. Plaintiffs argue that this evidence establishes that 1000 drums were sent to Alabama and remained there until after the March 17, 1976 incident, and they could not have been disposed of by Hulsey at the Site.

However, there is also contradictory evidence. Young testified that only 250 or 275 drums were sent to Alabama. Ex. 81 (Young Dep. at 71). This is corroborated by Young's statement to EPD in February 1976 that 250 drums were in Alabama. Ex. 84. The April 8, 1976 EPD trip report that states Young reported "all of the liquid waste" being held in Alabama had been returned and placed in the tanks (about 435 drums including the 80 from the Site), also states: "We do not know how many drums are involved. Mr. Chipley of Alabama Solid Waste mentions 'several hundred'; Mr. Honeycutt [Hunnicutt] of the same office states 1000 drums; and

discharged at that site. The *Bliss* court cited *Wade,* but distinguished it on its facts and reiterated the principle that "the [responsible party] bears the burden of tracing the waste." 667 F.Supp. at 1311. Plaintiffs' argument conflates the government's burden in establishing the liability of a responsible party in the first instance, with the government's burden to produce evidence linking additional waste to the Site once liability has already been established, to shift the burden back to plaintiffs with respect to geographic divisibility. This Court's finding that the government's evidence is sufficient to shift the burden back to plaintiffs with respect to their divisibility argument does not, and need not, address whether it would be sufficient evidence, in the absence of the 80 drums transported from Young's refinery to the Site on March 17, 1976, to establish that plaintiffs were responsible for any waste at the Site.

27. There are no existing records of what shipments, if any, were made to Borden Springs pursuant to this arrangement. An advance of $10,000 would have paid for 833 drums at a rate of $12 a drum.

28. The Court can only locate one document in the record relevant to this stipulated fact—

Exhibit 111. However, that exhibit indicates that as of an October 27, 1975 visit, Hunnicutt counted approximately 1000 drums at the Borden Springs facility. Ex. 111. It is therefore not clear what the source is for the stipulated fact that Hunnicutt reported in March 1976 that there may have been 1000 drums in Borden Springs. However, the Court will assume it has evidentiary support, since this fact has been stipulated to by the parties. It is also unclear whether Hunnicutt actually observed 1000 drums in March 1976. The stipulation reads: "[o]n March 21, 1976, [Hunnicutt] reported to Georgia environmental officials that there may be approximately 1000 drums at the Borden Springs facility." Ex. 2, ¶ 12. However, if his March 21, 1976 statement was based on his previous October inspection of the facility, and not on a March 1976 inspection, this stipulated fact does not establish that he observed 1000 drums still present at the facility in March 1976. Even if 1000 drums were in Alabama in October 1975, it is possible that some or all of the drums were shipped back to Douglasville before March 1976, consistent with Young's statement that the waste in Alabama was being returned (Ex. 84), and his testimony that 1200 or more drums were at the refinery in early March (Ex. 81 (Young Dep. at 55)).

Charles Young claims 250 drums." Ex. 82 at 2.[29] While the report appears to be referring to waste that had been returned already, as it states that all waste has been returned, the report of an April 30, 1976 Georgia EPD trip to Young's refinery states that "Young still has some waste in Alabama." Ex. 110. It is unclear if 800–1000 drums were shipped to Alabama or whether some portion of these drums was returned prior to March 1976.[30] While plaintiffs have suggested a possible explanation for the whereabouts of the rest of the CNSI drums, they have not, as found by the Magistrate Judge, proven by a preponderance of the evidence that no other CNSI drums were disposed of at the Site.

The First Circuit's holding in *O'Neil v. Picillo* supports this conclusion. In *O'Neil,* the vast majority of barrels excavated during the remediation could not be positively identified as belonging to either of two responsible parties, both of whom were defendants in the case. 883 F.2d at 181–82. The number that could be positively linked to either party was relatively small. *Id.* However, in rejecting defendants' argument that the district court erred in failing to apportion the costs of remediating and instead held them jointly and severally liable, the First Circuit stated that "[i]n light of the fact that most of the waste could not be identified, and *that the appellants, and not the government, had the burden to account for all of this uncertainty,* we think it plain that the district court did not err in holding them jointly and severally liable for the state's past removal costs." 883 F.2d at 182 (em-

phasis added). The court remarked that "[p]erhaps in this situation the only way appellants could have demonstrated that they were limited contributors would have been to present specific evidence documenting the whereabouts of their waste at all times after it left their facilities." *Id.* The court also noted that "the government presented evidence that much of Rohm and Haas' waste found at the site came from its laboratory in Spring House, Pennsylvania and that during the relevant years, this lab generated over two thousand drums of waste, all of which were consigned to a single transporter," and that "[u]nder these circumstances, where Rohm and Haas was entrusting substantial amounts of waste to a single transporter who ultimately proved unreliable, we simply cannot conclude, absent evidence to the contrary, that only a handful of the 2,000 or more barrels reached the site." *Id.* at 182–83.

The situation here is similar. Plaintiffs entrusted others to dispose of their hazardous waste. The person to whom this job was ultimately given, Hulsey, contracted with Young to dispose of 1200 or more drums in March 1976, and shortly thereafter, he was found in the darkness of night dumping CNSI waste at an unlicensed site some twenty miles from the place where the drums were stored. Hulsey's equipment that he used to bury the waste was located at the bottom of the ravine at the Site, and within a matter of weeks after agreeing to what proved to be a clandestine operation, only 435 drums of CNSI

---

**29.** This report does not identify when Hunnicutt or Chipley made these statements, or the basis for them. Therefore, it also fails to establish the stipulated fact at Ex. 2, ¶ 12, discussed above.

**30.** In addition, there is no evidence of the disposal of 800–1000 drums of waste from the Alabama facility after March of 1976. The

only record evidence of disposal subsequent to the March 1976 incident (other than the possibility of some incineration in April) is one tank truck (4870 gallons—approximately 89 drums) to North Carolina, and four loads of drums (315 drums) to Kentucky. Ex. 20. This is consistent with the disposal of approximately 404 drums-close to the quantity of 435 drums stored in the tanks as of April 8, 1976.

waste remained at Young Refining. This evidence, when coupled with the fact that the waste at the Site contained the same hazardous substances that the CNSI waste contained, provides a sufficient link between the additional hazardous waste found at the Site and the waste that plaintiffs and Continental entrusted to Young and in turn to Hulsey. This conclusion does not, as argued by plaintiffs, constitute a penalty for accepting liability for the 80 drums, nor is their liability premised on nothing more than speculation. Rather, there is sufficient evidence to conclude that other CNSI waste, beyond the 80 drums, was dumped at the Site by Hulsey. Since plaintiffs cannot show by a preponderance of the evidence that they are not responsible for any of the other waste besides the 80 drums that was dumped on March 17, 1976, it necessarily follows that they are not entitled to reimbursement.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for entry of judgment is denied and defendants' motion for entry of judgment is granted. An accompanying Order consistent with this Opinion will be issued.