CHEM–NUCLEAR SYSTEMS, INC., Plaintiff

Chemical Waste Management, Inc., Appellant

v.

George W. BUSH, In his official capacity as President of the United States of America, et al., Appellees

No. 01–5184.

United States Court of Appeals, District of Columbia Circuit.

Argued April 25, 2002.

Decided June 11, 2002.

James T. Banks argued the cause for the appellant. Patrick D. Traylor was on brief.

John L. Smeltzer, Attorney, United States Department of Justice, argued the cause for the appellees. Robert H. Oakley, Attorney, United States Department of Justice, was on brief.

Before: SENTELLE, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LECRAFT HENDERSON, Circuit Judge:

Chemical Waste Management, Inc. (CWM) appeals the district court's May 2, 2001 opinion and order (dated *nunc pro tunc* to March 26, 2001) denying its request for reimbursement from the United States for costs incurred in cleaning up portions of a polluted ravine (Basket Creek Site or Site) in Douglasville, Georgia. *See Chem–Nuclear Sys., Inc. v. Bush,* 139 F.Supp.2d 30 (D.D.C.2001) (*CNSI*); Joint Appendix (JA) 363–78. Pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.,* the Environmental Protection Agency (EPA or government) in 1991 had ordered CWM and others to clean up the Basket Creek Site, into which CWM (through other parties) had dumped at least 80 drums of hazardous chemical waste. Having expended nearly $8 million in cleanup costs, CWM sought reimbursement for removing a certain amount of waste for which, it alleges, it was not responsible. CWM argued in the district court that (1) it was not required to exhaust before the EPA— and therefore could present to the court— its claim that the waste from the 80 drums was "geographically divisible" from the rest of the waste such that it was entitled to a partial reimbursement for costs not associated with the 80 drums; (2) it had proven its geographic divisibility theory by a preponderance of the evidence, as required by CERCLA and the *Restatement (Second) of Torts*; and (3) the government had not carried its ensuing burden—placed upon it by the district court in a December 23, 1999 ruling—of producing evidence linking to the Site any further waste from CWM beyond the 80 drums. Declining to decide whether it (*via* a different district judge) had erred in placing that burden on the government, *see CNSI,* 139 F.Supp.2d at 31, 39 n. 17, the district court held that the government had "in fact sustained [the] burden" in any event, *id.* at 31, and entered judgment in its favor. We affirm the court's decision but on a slightly different ground. We hold that the burden of proving that only 80 CWM barrels were dumped at the Site was *always* CWM's to bear and that it has not proven, by a preponderance of the evidence on the record before us, that it is not liable for any additional waste at the Site.

## I.

During the 1970s CWM collected and stored liquid chemical waste materials in 55–gallon drums at its Barnwell, South Carolina facility. In July 1973 CWM hired Continental Trading Company (Continental) to remove hundreds of the 55–gallon drums from Barnwell. Based on its knowledge of each of the chemicals to be removed, CWM recommended to Continental that it sell, reprocess for sale, incinerate or solidify and bury the drums to be removed. *See* JA 33, 54–55 (CWM inventory as of May 10, 1973, listing chemicals, number of drums containing each chemical and recommended methods of drums' disposal).[1] Continental subsequently arranged with Young Refining Corporation (Young)—owned and operated by Dr.

---

1. CWM may or may not have recommended to Continental that it solidify and bury only about 153 to 182 drums of the chemicals. CWM states in its brief that it "recommended that only about 10,000 gallons of [chemicals] be solidified and disposed of in a landfill" and that "that amount would fill about 182 55–gallon drums." Br. of Appellant at 7 (citing Trial Ex. 4). Along the same line, CWM's inventory of May 10, 1973 indicates that Henry Schultz, an employee at the Barnwell facility, recommended to CWM that 153 drums of waste be solidified and buried. *See* JA 33, 54–55. The record, however, is silent on whether Schultz's recommendation was ever passed on to Continental.

C.B.F. Young (Dr. Young)—to store CWM's drums at Young's Douglasville, Georgia facility until Continental could arrange for the waste to be sold, reprocessed for sale, incinerated or buried. Between July 1973 and February 1974 Continental transported from Barnwell to Douglasville approximately 1,649 drums of chemical waste.

Although Young incinerated some unknown portion of the waste in the 1,649 barrels at the Douglasville facility, much of it could not be burned because it lacked sufficient BTU value or contained water. Moreover, the waste emitted a noxious odor when burned and, as a result, the Georgia Environmental Protection Division (EPD) objected to its incineration. Thereafter, Young halted incineration. According to the parties' stipulations, "Continental's and Young's records indicate that on or about September 26, 1974, Continental advanced Young $10,000 to move drums" containing waste that could not be incinerated or reprocessed "at a rate of $12 per drum to Young's Borden Springs, Alabama facility." JA 35. Dr. Young's deposition testimony indicated, however, that few if any of the drums (833 or so, if the arithmetic holds) made it to Borden Springs. In early March 1976 Dr. Young arranged with one Bartlett Hulsey to transfer chemical waste from the Douglasville facility to what Hulsey claimed was a "licensed" disposal site. According to Dr. Young's testimony, Hulsey stated that he would be willing and able to dispose of CWM's drums, all or most of which apparently remained at Young's facility:

Q: [Y]ou reached an agreement on a specific figure?

A: Yes.

Q: And how many drums was he going to dispose of for you?

A: I don't remember a specific number. He said, "I can dispose of those drums for you." We had them off to themselves sitting on the ground in the back of the plant. . . .

Q: How many drums were there?

A: Where? At our plant?

Q: Yes, there at the plant that you had gotten from [CWM] and Continental that Mr. Hulsey was going to move for you?

A: I would say that I've accounted for as many as, oh, 1200, 1400 drums, and maybe as high as maybe 1800 drums.

Q: And was it your understanding that Mr. Hulsey was going to dispose of all of those drums?

A: To the best of my knowledge, that was the agreement. He said, I can take care of these drums for you. And we made a deal.

JA 244 (quoted in *CNSI*, 139 F.Supp.2d at 40).

The Basket Creek Site—a ravine located along Basket Creek Road in Douglas County, Georgia—was owned in the 1970s by Lee Wallace, who operated it as an unlicensed landfill, permitting various entities on numerous occasions to dump waste materials into the ravine. The ravine itself is aligned in a north-south direction and slopes downward toward the south. As it deepens toward the south, the ravine widens; in the 1970s the south end of the ravine terminated at a dam of tires and soil.

On March 17, 1976 two tractor-trailer rigs owned by Hulsey transported approximately 160 drums (about 80 in each trailer) the twenty miles from Young's Douglasville facility to the Basket Creek Site. At approximately 9:45 p.m. Douglas Daniell—the Douglas County Supervisor of Environmental Health—arrived at the Site in response to a nearby resident's complaint. There Daniell saw Hulsey's two rigs—one

of which was already empty—along with four men, including Hulsey. In addition, Daniell observed approximately 80 drums in the ravine, some of which had broken open and others of which were being crushed and covered by a bulldozer. Daniell told the men at the Site not to dump the remaining drums and to wait there until he returned with the sheriff. When Daniell returned, the empty tractor-trailer and the second tractor were gone; the second trailer, still containing approximately 80 drums, remained at the Site. On March 18 Georgia EPD officials inspected the Site and confirmed that approximately 80 partially covered drums were in the bottom of the ravine. On March 21 Jack Hunnicutt of the Alabama Department of Health reported to the Georgia officials that Young's Borden Springs facility contained approximately 1,000 drums. By October 1976 the Site was closed and all of the drums and tires at the Site had been covered with dirt to prevent future dumping. For a number of years following the Site's closure, Daniell inspected the Site periodically and never detected any additional disposal of 55–gallon drums.

In 1990 the EPA began investigating the Basket Creek Site in order to determine whether an environmental response under CERCLA was necessary. On April 11, 1991 it issued an administrative order pursuant to CERCLA section 106(a), 42 U.S.C. § 9606(a), stating that it had determined "conditions at the Site may present an imminent and substantial endanger-ment to the public health or welfare, or the environment due to the release or threat of release of hazardous substances." JA 40. The order named CWM, Continental, Young and Hulsey as respondents and directed them to, inter alia, "excavate overlying soils and remove buried drums, sample and analyze drum contents, arrange for the proper disposal of drum contents, sample soils in the drum burial area, properly treat and/or dispose of any contaminated soil, and restore the Site to its original condition." Id. Continental, Young and Hulsey all denied liability and failed or refused to assist in performing the cleanup the EPA had mandated. CWM denied liability as well but notified the EPA that it would cooperate by performing "reasonable removal actions at the Site." JA 41.

Ultimately, CWM remediated the entire Site, incurring expenses of $7,660,315. Pursuant to CERCLA section 106(b)(2)(A),[2] CWM petitioned the EPA for reimbursement in the amount of $2,557,989—cleanup costs it asserted were not associated with the 80 drums. See CNSI, 139 F.Supp.2d at 34. On April 29, 1996 the EPA's Environmental Appeals Board (EAB) rejected CWM's petition for reimbursement, concluding that CWM was jointly and severally liable for the entire environmental harm to the Site and, consequently, for the entire cleanup cost. Still seeking reimbursement, CWM timely filed an action in the district court pursuant to CERCLA section 106(b)(2)(B).[3]

**2.** Section 106(b)(2)(A) provides that a party that has complied with an administrative order to clean up hazardous waste may "petition the President for reimbursement from the [Superfund] for the reasonable costs of such action, plus interest." 42 U.S.C. § 9606(b)(2)(A). The EPA serves as the authorized delegate of the President in CERCLA matters. See Exec. Order No. 12,580.

**3.** Section 106(b)(2)(B) provides that "[i]f the President refuses to grant all or part of a petition made under this paragraph, the petitioner may within 30 days of receipt of such refusal file an action against the President in the appropriate United States district court seeking reimbursement from the [Superfund]." 42 U.S.C. § 9606(b)(2)(B).

On January 9, 1998 the district judge to whom CWM's case was initially assigned[4] appointed a special master pursuant to 28 U.S.C. § 636(b)(2). In his report of September 2, 1999 the special master concluded that CWM had failed to exhaust its administrative remedies by neglecting to advance its geographic divisibility argument before the EAB and that, accordingly, it was precluded from raising the argument in district court. In an effort to assist the trial court further, however, the special master proceeded to address the merits of CWM's geographic divisibility claim, i.e., its theory that it could not be responsible for cleaning up areas north of where the 80 barrels came to rest because "the contents of the drums could not have migrated into [those] 'uphill' portion[s] of the ravine." JA 279 (special master's first report). While the special master found that CWM had established that the harm from *the 80 drums* was geographically divisible from the harm caused by other sources, he nonetheless recommended entry of judgment in favor of the government. "Crucial to [CWM's] successfully proving that it is entitled to reimbursement," the special master pointed out, "is the precise location of *all* [CWM] waste at the Site." JA 302 (emphasis added). CWM's geographic divisibility claim ultimately failed, he held, because CWM was unable to "prove by a preponderance of the evidence that *other* waste delivered by [CWM], through Continental, to Young, did not find its way into the Site." *Id.* (emphasis added).

On December 23, 1999 the district court issued a memorandum opinion (1) rejecting the special master's recommendation that the case be dismissed for failure to exhaust administrative remedies; (2) holding that

"[t]o the extent [CWM has] proved the 'harm' it caused is geographically divisible from the remaining contamination of the Site, [the] *EPA* must submit proof that [CWM] contributed to other harm at the Site before the burden shifts to [CWM] to prove that it is not liable for those other harms," JA 340 (emphasis added); and (3) remanding the case to the special master "for further findings on [CWM's] claim for reimbursement," JA 341. On remand, the special master concluded in a September 18, 2000 report that the government did not satisfy the specially imposed burden of linking CWM "to the harm beyond the 80 drum area of the Site so as to shift the . . . burden of proof back to [CWM]." JA 343.

And so the parties returned to the district court, this time before the judge to whom the case had been reassigned on February 28, 2000. *See* JA 6; *supra* note 4. The district court rejected the special master's September 18, 2000 conclusion, *see CNSI,* 139 F.Supp.2d at 39–40, finding that "the evidence raises a reasonable inference that [CWM] caused harm at the Site beyond the 80 drums, thereby *shifting* the burden *back* to [CWM] to disprove this inference," *id.* at 39 (emphasis added). Because CWM was unable to meet the burden, *see id.,* the court held that the government was entitled to judgment. In so holding, the district court noted that it did not need to address whether CWM was required to exhaust administrative remedies as to its geographic divisibility claim. *See id.* at 39 n. 17. More importantly, as we have mentioned, the court declined to "revisit the correctness of [the original judge's] ruling[] that . . . the government has the burden to produce evidence linking [CWM] to waste beyond the

---

**4.** The original judge retired in 2000 and the case was reassigned. *See CNSI,* 139

F.Supp.2d at 34 n. 9.

80 drums at the Site," *id.*, because it found that burden satisfied.

## II.

■ On appeal CWM makes the same three contentions it made in district court, namely (1) that it was not required to exhaust before the EPA—and therefore could present to the courts—its claim that the waste from the 80 drums was geographically divisible from the rest of the waste at the Site; (2) that it proved geographic divisibility by a preponderance of the evidence; and (3) that the government did not carry its subsequent burden— placed upon it by the original district judge—of linking to CWM waste beyond the 80 drums. Assuming without deciding that CWM was not required to exhaust its geographic divisibility claim before the EPA, we find that CWM has not proven geographic divisibility in any event.

CWM does not and cannot contend that it escapes liability altogether for any environmental harm to the Site; CWM is plainly liable, under CERCLA section 107(a), in its capacity as a party "who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such [party]." 42 U.S.C. § 9607(a)(3). And CWM is jointly and severally liable for the *entire* harm to the Site, irrespective of the fact that other parties may have contributed thereto, *see O'Neil v. Picillo,* 883 F.2d 176, 179 (1st Cir.1989) ("Congress intended for those proven at least partially culpable to bear the cost of the uncertainty"), unless it can affirmatively establish some basis for dividing the harm, *see United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 268 (3d Cir.1992). Under section 433A of the *Restatement (Second) of Torts*—"[t]he universal starting point for divisibility of

harm analyses in CERCLA cases," *United States v. Hercules, Inc.,* 247 F.3d 706, 717 (8th Cir.2001)—CWM can avoid joint-and-several liability for the full response cost of $7,660,315 if it demonstrates (a) that "there are distinct harms" to the Site, for some of which it is not liable; or (b) that "there is a reasonable basis for determining [its] contribution ... to a single harm." Restatement (Second) of Torts § 433A(1) (1965); *see id.* § 433A(2) ("Damages for any other harm cannot be apportioned among two or more causes."); 42 U.S.C. § 9606(b)(2)(C) ("[T]o obtain reimbursement, the petitioner shall establish by a preponderance of the evidence that it is not liable for response costs....").

CWM does not maintain that there were "distinct harms" to the Basket Creek Site. As the government points out, the harm at issue was "the release or threatened release of hazardous substances into groundwater," Br. of Appellees at 36 (citing JA 128–29); that harm was indivisible because "there was no evidence that the [Site] contained distinct pockets of waste that caused or could cause separate and distinct plumes of groundwater contamination." *Id.* at 37. CWM resorts instead to section 433A(1)'s second prong, arguing that there is a reasonable basis for determining its *contribution* to the undivided harm. Specifically, CWM claims that those portions of the Site uphill of the drums "could not have been contaminated by Hulsey's dumping" for the simple reason that "liquid runs downhill." Br. of Appellant at 28. CWM might well be correct that uphill portions of the Site were not contaminated by the 80 identified drums. It does not necessarily follow, however, that CWM has proven geographic divisibility.

■ Part and parcel of CWM's burden of proving that "there is a reasonable basis for determining [its] contribution ... to [the] single harm," Restatement (Second)

of Torts § 433A(1)(b), is a showing that only 80 drums were dumped at the Site. As another circuit has held, the *Restatement* permits a polluter to escape joint-and-several liability for the entire harm only "if it can meet its burden of proving the *amount of the harm* that it caused. If it is unable to do so, it is liable for the full amount of the harm." *Bell Petroleum Servs., Inc. v. Sequa Corp.*, 3 F.3d 889, 896 (5th Cir.1993) (citing Restatement (Second) of Torts § 433B(2)) (emphasis added). In other words, CWM can prove "the amount of the harm that it caused" was less than $7,660,315 worth of cleanup costs only by demonstrating that it dumped no more than 80 barrels. Accordingly, although the district court declined to "revisit the . . . ruling[ ] that . . . the government has the burden to produce evidence linking [CWM] to waste beyond the 80 drums at the Site," *CNSI*, 139 F.Supp.2d at 39 n. 17, we conclude that the ruling was in error. The special master correctly held in his first report that the burden was CWM's to bear, *see* JA 302; it should not have been shifted to the government thereafter.

■ Whether CWM has carried its burden is a question of law that we review *de novo*. *See Bell*, 3 F.3d at 896 ("The question whether the harm . . . is capable of apportionment . . . is a question of law." (citing Restatement (Second) of Torts § 434(1)(b))). On the record before us, *see supra* Part I, we agree with the district court's conclusion that CWM "cannot prove by a preponderance of the evidence that [it is] not liable for any additional waste" beyond the 80 drums. *CNSI*, 139 F.Supp.2d at 39.

True, in attempting to account for all of the 1,649 drums it arranged to have Continental ship, CWM cites several facts which together bolster, at least theoretically, a conclusion that it dumped no more than 80

drums: Continental's and Young's records could support an inference that approximately 800 of the 1,649 drums were to be shipped to Young's Borden Springs, Alabama facility; CWM's May 10, 1973 inventory could support an inference that CWM recommended only 153 to 182 drums be solidified and buried in a landfill, *see supra* note 1 and accompanying text, and that the 153 to 182 drums were the same drums in Hulsey's two rigs on the night of March 17 and were the only drums to be dumped, *see CNSI*, 139 F.Supp.2d at 32 (Hulsey "transported *approximately* 160 drums . . . from Young Refining to the Basket Creek Site" (emphasis added)); and, finally, the parties' stipulation that Young incinerated at Douglasville some unknown portion of CWM's waste could support an inference that it in fact incinerated the approximately 700 drums of waste remaining.

The foregoing chain of possible inferences, however, is insufficient to satisfy CWM's burden of proof under the *Restatement* and under CERCLA. CWM's theory of the evidence turns on one crucial but unproven assumption—namely, most or all of the drums Hunnicutt counted on March 21, 1976 at the Borden Springs facility were CWM's. Without establishing this assumption as a fact, CWM cannot show (and we cannot conclude) that its drums ever made it to Borden Springs, whatever Continental's or Young's records might indicate. Moreover, CWM's theory crumbles under the weight of even a few countervailing facts: Dr. Young's deposition testimony suggests that *all* of CWM's drums were to be dumped at the Basket Creek Site; the fact that the same types of hazardous substances that came from CWM's drums were found all over the Site, not only in the southern (downhill) portion, suggests that CWM drums—beyond the acknowledged 80—were dumped

into northern portions of the Site; and the fact that Young halted incineration when the Georgia EPD objected to the noxious fumes from CWM's waste suggests that Young may not have incinerated all 700 of the "unaccounted for" drums.

In short, while CWM produces some circumstantial evidence to support its theory of geographic divisibility, it has not managed the "very difficult proposition" of proving its theory by a preponderance of the evidence.[5] *Hercules,* 247 F.3d at 717; *see* Restatement (Second) of Torts § 433A(2) cmt. *i* (noting difficulty of apportioning certain kinds of harm and cautioning against "arbitrary apportionment for its own sake"). Accordingly, the district court's denial of CWM's request for reimbursement is

*Affirmed.*

---

5. Nor has CWM convinced us that relief is warranted based on the alternative ground that the government's "delay in responding to Hulsey's dumping denied CWM the ability to defend itself against [the] EPA's accusations" and thereby denied it due process of law in violation of the Fifth Amendment to the United States Constitution. Br. of Appellant at 39 (capitalization altered). As the government points out, CWM's due process claim "is premised on the patently erroneous suggestion" that the EPA could have notified CWM of its potential CERCLA liability in March 1976, i.e., before CERCLA was even enacted. Br. of Appellees at 54. Furthermore, only about one year elapsed between the EPA's 1990 investigation into Douglasville residents' complaints about drinking water and its issuance of a cleanup order in April 1991; thus, CWM cannot even show governmental delay, much less delay so extended that it implicates due process.